**FILED**

MAR 0 9 2011

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**CHARLENE F. SHEETS,**

      **Plaintiff,**

v.

                           **Civil Action No. 2:10CV58**
                           **(The Honorable John Preston Bailey)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and/or Plaintiff's Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record and Defendant's Motion for Summary Judgment and have been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Charlene F. Sheets ("Plaintiff") filed an application for DIB on October 1, 2007, alleging disability since April 28, 2007, due to "post traumatic syndrome, back pain, 2 ruptured discs, hip problems, knee problems, right shoulder, depression, diffuse lumbar spondylosis with multiple degenerating and bulging herniated discs, pinched nerve in neck, panic attacks, degenerative disk in neck, weakness in right hand" (R. 27, 95, 119). Plaintiff's applications were denied at the initial

and reconsideration levels (R. 50, 51). Plaintiff requested a hearing, which Administrative Law Judge Brian P. Kilbane ("ALJ") held on February 26, 2009 (R. 23-49). Plaintiff, represented by counsel, Roger Foreman, testified on her own behalf (R. 29-45). Also testifying was Vocational Expert Jay Herbert Pearis ("VE") (R. 45-48). On August 4, 2009, the ALJ entered a decision finding Plaintiff was not disabled (R.10-20). On February 23, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. STATEMENT OF FACTS

Plaintiff was born on September 5, 1957, and was fifty-one years old at the time of the administrative hearing (R. 95). Plaintiff's past employment was golf course maintenance worker, house cleaner, carpenter's helper, school bus driver, pressman, parking deck supervisor at airport, and department manager in a grocery store (R. 35-36).

An August 26, 2004, MRI of Plaintiff's lumbar spine showed "diffuse lumbar spondylosis with multiple degenerating and bulging or herniated discs, the largest being L4-5 right lateral extrusion pattern of disc herniation causing right neural foraminal stenosis" (R. 549).

On January 28, 2007, Plaintiff presented to Dr. John P. Kowalski with depression, chronic and low back pain. Dr. Kowalski prescribed Ciprofloxacin, Percocet and Wellbutrin (R. 458).

On February 24, 2007, Plaintiff presented to the VCU Health System emergency department with right neck and shoulder pain. She was medicating with Wellbutrin (R. 232). Plaintiff's HEENT, neck, back, respiratory, abdominal, neurological, psychological, and extremity examinations were normal. She had full, but painful, ranges of motion of her right neck/shoulder. Plaintiff was diagnosed with cervical radiculopathy and prescribed Lortab (R. 234).

On April 23, 2007, Plaintiff presented to the VCU Health System emergency department with

a gunshot wound to her abdomen (R. 245). Upon examination, Plaintiff was diagnosed with a "graze" wound to her right upper quadrant (R. 247). She was administered a tetanus booster and released to home (R. 247).

On May 21, 2007, Plaintiff presented to the Chippenham/Johnston-Willis ("CJW") Medical Center for feeling "very anxious." She stated it caused sleep disturbances and appetite changes (R. 266). Plaintiff was tearful (R. 273). Plaintiff's eye, ENT, neck, respiratory, cardiovascular, GI/GU, musculoskeletal, skin, neurologic, and psychiatric examinations were normal (R. 267, 272).

Plaintiff's chief complaints were for "'nervous breakdown.'" She reported she had been nervous, anxious, and depressed and had experienced suicidal thoughts. Plaintiff reported she medicated with Oxycodone (R. 274). She was prescribed Wellbutrin, Ambien and Ativan (R. 328).

Plaintiff reported her past medical history as positive for migraines, hepatitis B, degenerative disk disease, carpal tunnel syndrome, herniated disk, MRSA, anxiety, and gunshot wound (R. 281).

On May 22, 2007, a mental status examination was conducted while Plaintiff was a patient at CJW Medical Center. Plaintiff stated she was depressed and anxious since she had sustained a gunshot wound and her son had tried to protect her. She was fearful of leaving the house, tearful and overwhelmed. She stated that she "wished the bullet would have killed" her. She was not sleeping well and had "exaggerated startle response." Plaintiff was prescribed Wellbutrin (R. 284).

Plaintiff's mental status examination produced the following: Plaintiff was obese, disheveled and sad. She made direct eye contact; her attitude was cooperative; her psychomotor behavior was underactive; Plaintiff's speech was spontaneous and coherent; she had no hallucinations; her affect was blunted and her mood was sad; Plaintiff's thought organization was goal directed and obsessive; her thought content was phobic about leaving the house and obsessive; Plaintiff's consciousness was

alert; she was oriented as to time, place and person; Plaintiff's insight was fair; her intelligence was average (R. 285). Plaintiff was diagnosed with major depressive disorder and PTSD (R. 286).

Plaintiff was released from CJW Medical Center on May 25, 2007 (R. 263). Plaintiff "denied any further suicidal ideation . . . [,] was less frightened about going home and less anxious overall and was future oriented and pleasant in her interactions." Plaintiff "indicated a readiness for discharge." She was referred to Henrico Area Mental Heath Center (R. 264).

On May 31, 2007, Plaintiff was assessed by Sylvia Uhlman, L.C.S.W., at Henrico Area Medical Health Center. Plaintiff was anxious, depressed and "appear[ed] to have symptoms associated with PTSD secondary to being shot in her home on 4/23/07." Plaintiff was "anxious and fearful, hypervigilant, unable to enjoy activities," and had memory loss and flashbacks. She denied suicidal or homicidal ideations. She stated she was "doing okay until the shooting" (R. 377).

Plaintiff reported she lived with her husband and sons, who were aged twenty-three and twenty-one. Her husband was employed; she "enjoy[ed] physical activities, such as reading, fishing, window shopping." She reported she had arthritis, degenerative disk disease, and pinched nerves (R. 378). Plaintiff stated she medicated with Wellbutrin (R. 379).

Upon examination, Plaintiff's appearance was tense; mood was anxious; range of affect was labile; memory was impaired; and appetite was poor. Her behavior, motor disturbance, orientation, thought content and process, perception, sensorium, sleep, and insight were normal (R. 379). Plaintiff's estimated intellectual function was average. Plaintiff denied suicidal or homicidal ideations. Ms. Uhlman noted that Plaintiff "should benefit from brief therapy and medication" and diagnosed PTSD, other psychosocial problems and problems with access to health care. Plaintiff's GAF was listed as fifty (R. 380, 382). Plaintiff was prescribed Wellbutrin (R. 377).

Also on May 31, 2007, Joan Liverman, M.D., a psychiatrist at Henrico Area Medical Health Center, completed a psychiatric evaluation and treatment plan. Plaintiff reported she voluntarily entered the hospital "'when things got too much to handle.'" Dr. Liverman noted Plaintiff "appear[ed] to be experiencing symptoms associated with PTSD." Plaintiff reported being anxious, not enjoying her usual activities, having flashbacks, and being isolative and depressed. Plaintiff reported she had been "in therapy many years ago." Plaintiff stated she was prescribed Wellbutrin for treatment of her symptoms, but she "could not afford the medication." Plaintiff was informed that Wellbutrin was not the drug therapy "of choice for PTSD but [Plaintiff did not] want to take anything which [would] affect her sex drive" or cause weight gain. Plaintiff stated she was "interested in applying for disability although she deni[ed] previous psychiatric issues." Plaintiff reported she was "being investigated by a grand jury re charges of distribution of cocaine which she deni[ed]" and she had sold her home and planned to move to West Virginia (R. 384).

Plaintiff medicated with Percocet; her current history of substance abuse was positive for THC; and Plaintiff "smoked THC 3-4 xs/day for many yrs. until 5/9/07" (R. 385-86). Plaintiff stated she had been "unemployed since she had a conflict with her business partner and quit" and that "all her employers have wanted her to choose between her job and her family" (R. 386).

Dr. Liverman's mental status examination showed Plaintiff's appearance, behavior, speech, affect, thought content, and sensory were within normal limits. Plaintiff's mood was anxious and her thought process was tangential and circumstantial (R. 386). Dr. Liverman diagnosed THC dependence "in very early remission," PTSD, and mixed personality disorder. Plaintiff was provided samples of Wellbutrin and prescribed Bupropion which was, according to Dr. Liverman, "more affordable as [Plaintiff] will not qualify for indigent program with family income" (R. 387).

On June 22, 2007, Dr. Liverman completed a mental status examination of Plaintiff. Her appearance, behavior, speech, affect, mood, thought process and content, and sensory were all within normal limits. Plaintiff reported she was "less depressed and [was] able to deal with stress better now. She continue[d] to have some anxiety attacks but they have decreased." She was diagnosed with THC dependence, early remission; PTSD; and mixed personality disorder (R. 373). Plaintiff was prescribed Wellbutrin (R. 374). Dr. Liverman "declined" to prescribe Xanax and Plaintiff "rejected other alternates as potentially making her too sleepy" (R. 373).

On September 27, 2007, Plaintiff presented to the Pocahontas Memorial Hospital emergency department with complaints of neck pain. Plaintiff was injected with Norflex (R. 391, 462). An x-ray of Plaintiff's cervical spine showed degenerative disk disease, with narrowing of the intervertebral disk space, and spondylosis at C5-C6 (R. 399, 470). Plaintiff was released and stated she experienced "slight relief of pain & felt she could sleep once she got home" (R. 393, 464).

On October 3, 2007, Plaintiff was examined by to John C. Sharp, D.O. Plaintiff stated she was depressed and her symptoms were aggravated by lack of sleep and past traumatic memories. Plaintiff stated she experienced anxiety, chest pain, palpations, crying spells, dizziness, fatigue, lack of appetite, lack of interest, low self esteem, nausea, vomiting, social phobia. Plaintiff reported she had had a nervous breakdown in April, 2007. Plaintiff stated she once thought she would "have been better off killed when she was shot, but doesn't have thoughts of this anymore." Plaintiff had no suicidal ideations. She stated medicine was a "relieving factor." Plaintiff stated she "was seeing a psychologist but [] [did not] have the money at this time." Plaintiff stated she had a ruptured disk, decreased mobility, numbness, spasms, tingling in legs, weakness and neck pain (R. 407, 472).

Dr. Sharp noted Plaintiff's chronic conditions were depression, neurotic; nonallopathic

lesion in lumbar region; and nonallopathic lesion in cervical region. Plaintiff reported she experienced no "chills, pallor, fatigue, fever, weakness, malaise, night sweats, insomnia, weight loss, activity change, lethargy" (R. 407). Plaintiff was positive for weight gain and irritability. Plaintiff's HEENT, respiratory, cardiovascular, vascular, gastrointestinal, and metabolic/endocrine examinations were normal. Plaintiff stated she was anxious, paranoid, and irritable and had depressed mood and panic attacks. Dr. Sharp noted muscle spasm at her cervical and lumbar spine. Plaintiff's extremities were normal. Plaintiff's deep tendon reflexes were symmetrical. Dr. Sharp prescribed Wellbutrin and Xanax (R. 408). Dr. Sharp ordered exercise for back and quadricep, recommended a walking program, and instructed Plaintiff to diet (R. 409, 474).

On October 9, 2007, Plaintiff completed a Function Report for the purposes of pursuing a disability claim. She wrote that she woke at 7:00 a.m., cared for her dogs, made/drank coffee, watched television, cleaned "if [she was] not hurting to (sic) bad," fed the lizard, watched television, prepared meals when she "[felt] like eating," washed dishes "when necessary," watched television, showered when she "[felt] like" it, retired at 11:00 p.m. (R. 150). Plaintiff reported that she cooked, washed clothes and cleaned up for her husband when he visited (R. 151). Plaintiff cleaned and cooked "more" when her sons visited (R. 164). Plaintiff wrote she fed and watered her pets and bathed them monthly, but she could "not walk them anymore, like [she] use too (sic)." Plaintiff reported she could not garden "like she use too (sic)." Plaintiff reported she no longer went outside, could not "be around alot (sic) of people," could not go into stores, could not walk "down a public street," and had to force herself to "go out" (R. 151). Plaintiff drove. Plaintiff wrote she left the house and drove "alone" but did not "like" to do it (R. 153). Plaintiff shopped for food and groceries "only" when she "really need[ed] anything" (R. 153). Plaintiff prepared soup or sandwiches when

she dined alone; however, when her husband was present, she prepared breakfast and dinner. Plaintiff wrote she prepared full meals "every other weekend" and that it took her a "couple of hours" to cook. She had to "rotate from standing and sitting" while she cooked. Plaintiff cleaned, did the laundry, cut the grass "when [she could]." Plaintiff wrote she could not clean the whole house in one day and if she cut the grass, that was the only chore she could accomplish that day (R. 152). Plaintiff watched television, read, listened to music, and interacted with her pets (R. 154). Plaintiff used to be able to read a "romance" novel in a day and one-half, but it took her longer now to complete (R. 154). Plaintiff worked at the computer and talked on the telephone (R. 155).

Plaintiff was prescribed Wellbutrin on October 29, 2007, by Dr. Sharp (R. 475).

On November 1, 2007, Tina Fontenot, M.S., a licensed psychologist, completed a "West Virginia Disability Consultative Evaluation Report" of Plaintiff. Ms. Fontenot noted Plaintiff was the only source of information for the report. Plaintiff was cooperative; her posture and gait were normal; she weighed 250 pounds and stood five feet, five inches tall (R. 414). Plaintiff stated she was applying for benefits because she had "'back problems, degenerative disk disease, and two ruptured disks." Plaintiff stated she also had a pinched nerve in her neck, which caused "muscles to put her collarbone and ribs out of place." Plaintiff stated she had "a bad hip"; had been diagnosed with PTSD; had a history of migraines; and her knees would swell (R. 415).

Plaintiff stated she had been "depressed on and off for the last 23 years." She had difficulty sleeping, appetite fluctuations, low energy, and fatigue. Plaintiff stated she had always been paranoid; she felt hopeless and helpless; she worried. She experienced anxiety, but not on a daily basis. In a Social Security Disability Report – Adult – Form, which Ms. Fontenot reviewed, Plaintiff "wrote that what limit[ed] her ability to work [was] Posttraumatic syndrome, back pain, two

ruptured disks, hip problems, knee problems, right shoulder problems, depression, diffuse lumbar spondylosis with multiple degenerating and bulging herniated disks, a pinched nerve in neck, panic attacks, degenerative disk in neck, and weakness in right hand." Plaintiff wrote that she experienced pain constantly and daily; she dropped "things"; her right arm and leg went numb "almost instantly" when she sat; and she could not carry anything over ten pounds (R. 415). Plaintiff wrote that she was "afraid to be around other people" and "stay[ed] in her home a great deal" (R. 416).

Plaintiff reported she had been an in-patient at a psychiatric hospital in May, 2007; that she received mental health services from a psychiatrist twice at Henrico Area Mental Health Center; that she had not received any counseling services. Plaintiff stated her family physician was Dr. Sharp, who prescribed Wellbutrin. Plaintiff stated she used to treat panic attacks with Xanax, but no longer did; she "experienced panic attacks on a routine basis" (R. 416).

Ms. Fontenot found the following: attitude/behavior was motivated; oriented times four; depressed mood; tearful affect; normal thought process and content; normal perception; normal psychomotor behavior; normal judgment; mildly deficient immediate memory; moderately deficient recent and remote memory; normal concentration; normal persistence; mildly slow pace; and normal social functioning (R. 417).

Plaintiff reported her daily activities as follows: rose between 6:00 a.m. and 7:00 a.m., cared for her pets, drank coffee, slowly cleaned house, did laundry, did dishes, cooked, paid bills, grocery shopped, and managed her personal grooming. Plaintiff stated that after she cleaned house, she experienced pain, her knee swelled, and she had difficulty bending. During her recitation of activities, Plaintiff "became very tearful . . . stating that she would like to receive some help, and that she knows she needs counseling, but she does not have a medical card" (R. 417).

Ms. Fontenot diagnosed PTSD, depressive disorder (NOS), and panic attacks with agoraphobia. Ms. Fontenot wrote that her diagnosis of PTSD was based on Plaintiff's reporting she had been shot in April 2007 and moved to West Virginia because she no longer felt safe in Virginia; that she had flashbacks; she was unable to relax; she felt anger. Ms. Fontenot based her diagnosis of depressive disorder (NOS) on Plaintiff's exhibiting a "depressed mood and tearful affect, mildly deficient immediate memory, moderately deficient recent and remote memory, as well as . . . being in a sad mood on a daily basis and sleep and appetite disturbances." Ms. Fontenot based her diagnosis of panic attacks on Plaintiff's statements that she experienced them "sometimes on a daily basis" and she could describe "what these panic attacks [felt] like" in "great detail." Ms. Fontenot's prognosis was "fair with appropriate psychological medical intervention" (R. 418).

On November 6, 2007, Plaintiff presented to Dr. Sharp for a disability physical. Dr. Sharp noted he could not "do disability PE on ortho-problems w/o definitive DX" and that he "need[ed] ortho-referral." Plaintiff reported back, neck, right shoulder, and bilateral knee pain and depression. Dr. Sharp noted Plaintiff's two-month old x-ray showed deteriorating disk disease. Dr. Sharp noted Plaintiff's chronic conditions were depression (neurotic); nonallopathic lesion of the lumbar and cervical regions. Plaintiff was positive for weight gain and migraine headaches (R. 410, 476). Plaintiff reported she was anxious, fearful, paranoid, irritable and had depressed mood, mood swings, and sleep disturbance (R. 411).

Upon examination, Plaintiff was alert, in moderate distress, overweight, depressed (R. 411). Plaintiff had no cervical adenopathy or tenderness. Her cervical, thoracic, and lumbar spines had muscle spasms. Plaintiff had mildly reduced range of motion in her cervical spine and moderately reduced range of motion in her lumbar spine. Plaintiff's right shoulder had moderately reduced

range of motion and tenderness. There was tenderness in both knees. Plaintiff's extremities appeared normal. She was alert and oriented, times three. She had grossly normal intellect; her memory was intact; she had no sensory loss, no motor weakness. Her balance, gait, coordination were intact, fine motor skills were normal, and deep tendon reflexes were symmetrical. Dr. Sharp noted Plaintiff had anxiety, depressed affect, fear, hopelessness, mood swings, agitation, and paranoia (R. 412, 478). Dr. Sharp prescribed Xanax and Wellbutrin (R. 413).

Also on November 6, 2007, Dr. Sharp completed a "Routine Abstract Form – Physical" of Plaintiff. Dr. Sharp noted Plaintiff had relocated from Virginia to West Virginia in August, 2007, and that he first treated her on October 3, 2007, for "back pain, hip problems, knee problems, right shoulder, back pain, lumbar spondylosis, degenerative disk and pinched nerve in neck, right hand weakness," and depression. Dr. Sharp noted he "need[ed] records from Virginia Dr. Kowalski" (R. 402). Dr. Sharp found Plaintiff's vision, hearing, speech, gait and station, gross motor ability, muscle bulk, reflexes, sensory, coordination, breath sounds, orthopena, cyanosis, edema, cardiovascular, and digestive systems to be normal. Plaintiff's fine motor ability was positive for decreased grip strength in her right hand and normal range of motion. Plaintiff's ranges of motion in her neck, lumbar, and right upper extremity were decreased. Plaintiff's motor strength was weak in her left and right upper and lower extremities. Her mental status was depressed. Plaintiff was positive for dyspnea with exertion (R. 403-05). Plaintiff's medications were listed as Wellbutrin, Darvocet, and Xanex. Dr. Sharp diagnosed situational depression, lumbosacral sprain, L4-L5 disk herniation, right shoulder strain with possible rotator cuff involvement, bilateral carpal tunnel syndrome, and degenerative arthritis in the knees (R. 405, 406). Dr. Sharp opined that, in addition to the orthopedic consultation, Plaintiff needed a psychological consultation. He wrote that he is

"only a family practice physician. I have seen this patient once before this exam which is cursory at best. No records of any account" (R. 406). Dr. Sharp noted he "need[ed] old records" (R. 405).

On December 7, 2007, Amy Wirts, M.D., completed a "Physical Residual Functional Capacity Assessment" of Plaintiff (R. 421-28). Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, and could push/pull unlimited (R. 422). Dr. Wirts found Plaintiff could occasionally climb ramps/stairs, climb ladder/rope/scaffolds, balance, stoop, kneel, crouch and crawl (R. 423). Plaintiff had no manipulative, visual or communicative limitations (R. 424-25). Dr. Wirts opined Plaintiff should avoid concentrated exposure to extreme cold, vibrations, and hazards. Plaintiff's exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 425). Dr. Wirts noted Plaintiff's statement were "mostly credible" and that the "severity of allegations are not well supported and allegations do not meet listing level severity using SSA criteria. She lets dogs out, does some cleaning, feeds lizards, prepares meals, does dishes, cuts grass when can" (R. 426). Dr. Wirts, in making her findings, reviewed the February 24 and April 23, 2007, records from VCU Health System; September 27, 2007, records from Pocahontas Memorial Hospital; and the October 3 and November 6, 2007, records of Dr. Sharp (R. 428).

On December 7, 2007, Sheila Rose, M.S., a licensed psychologist, completed a psychological examination of Plaintiff[1]. Plaintiff was "self-referred for psychotherapy services following a gunshot

_____

[1] The record contains a "Treatment Summary" by Ms. Rose. That summary is a listing of Plaintiff's sessions with Ms. Rose for "individual psychotherapy to address Post-Traumatic symptoms related to shooting incident, as well as subsequent depressive symptoms." The summary lists the following dates of services: December 14, 2007; January 3, and 10, 2008; February 1, 5, 21 and 26, 2008; March 11 and 18, 2008; April 4, 2008; May 2 and 6, 2008; however, no treatment notes for these therapy sessions were contained in the record (R. 509, 514)

wound." Plaintiff stated she experienced "significant anxiety symptoms" and had "difficulty adjusting to living here without her husband," who lived elsewhere for "employment and finances." Her father verbally and emotionally abused her and she had been sexually molested as a child but was "not yet willing to talk about the abuse." Plaintiff and her husband had two sons; the younger son had "problems with drugs, and his involvement may have been the cause of the shooting . . . ." Plaintiff and her husband had "significant financial problems, as they had to sell their home in Virginia for a loss in order to buy their retirement home here." Plaintiff stated she could no longer live in Virginia due to PTSD caused by the shooting (R. 510).

Plaintiff reported she had carpal tunnel surgery on both wrists, "deteriorating disc disease in her spine and mild spinal bifida," heel spurs, and pinched nerve in collar bone area. Plaintiff reported that being shot was her "latest problem." "She stated that . . . the bullet went in and out of her stomach. . ., [she] was in and out of the hospital in less than two hours. . ., [she] complained about the care she received, and [she] stated that they did not even clean the wound." Plaintiff stated she had been hospitalized for five days in May of 2007 for a "'nervous breakdown.'" She experienced anxiety after the shooting incident, but "did not 'have the guts' to kill herself." Plaintiff stated she did not receive counseling because her husband "made too much money for her to qualify for services from the local mental health center . . .," and she did not have insurance (R. 511).

Plaintiff reported attending several different schools due to her father's being in the military; she reported difficulty with attention and concentration; she stated she had been "tied to her seat while in school." Plaintiff stated both of her sons have ADHD and she felt she had it, too (R. 511).

Plaintiff stated that, after the shooting, she had been "treated . . . as a 'drug dealer'" by the police, who "implied that it was her own fault that she had been shot" (R. 511). Plaintiff stated she

had not worked recently due to her injuries, physical health, and "fear." Plaintiff stated she did not

abuse drugs, but had been "treated as a drug abuser by people in the medical community" (R. 512).

Plaintiff stated she avoided the windows in her home and stayed upstairs at night; became

physically and emotionally anxious around the time she was shot; could not watch any television

programs that contained violence; avoided people; could not be in crowds; slept with difficulty; was

irritable; could not concentrate; had exaggerated startle response; was withdrawn. Plaintiff stated

she "experienced some of these symptoms prior to the shooting incident." Plaintiff stated she cried

easily, felt she would be "better off dead," stuttered, had tremors, and felt "very alone." Plaintiff had

"shown a pattern of avoidant behavior throughout her adult life." She avoided "jobs that required

frequent interaction with others." Plaintiff had difficulty trusting others, she felt inferior, and she

demonstrated intense and abrupt anger (R. 512). Ms. Rose's diagnosis was as follows: Axis I –

PTSD, chronic; major depressive disorder, recurrent, severe without psychotic features; Axis II –

borderline personalty disorder; Axis III – past gunshot wound and chronic pain. Ms. Rose's

prognosis was "poor." She found Plaintiff would be "able to manage funds" (R. 513).

On December 17, 2007, Plaintiff presented to Dr. Sharp to "discuss disability paperwork."

Plaintiff reported she had not been medicating with Wellbutrin because of "financial issues."

Plaintiff stated she had been receiving counseling from Sheila Rose. Plaintiff reported insomnia,

weight gain, and change in activity; Dr. Sharp noted she was positive for headaches (R. 449, 480).

Dr. Sharp noted Plaintiff was anxious, fearful, paranoid, irritable and had depressed mood, sleep

disturbance, and mood swings. Dr. Sharp noted Plaintiff had bilateral knee pain, right shoulder

pain, limited range of motion, bilateral wrist pain, lumbar spine pain that radiated to right leg,

cervical spine pain that radiated to right arm. Plaintiff was observed to be "alert, moderate[ly]

distress[ed], overweight, depressed" (R. 450, 481). Dr. Sharp noted muscle spasm in Plaintiff's cervical, lumbar, and thoracic spine regions. Plaintiff was oriented, times three. Her intellect was grossly normal; her memory intact; she had no sensory loss or motor weakness; her balance, gait and coordination were intact; her fine motor skills were normal and her reflexes were normal. Plaintiff was anxious, fearful, agitated, and paranoid and felt hopeless, had mood swings, and had depressed affect. Dr. Sharp diagnosed chronic panic disorder, chronic depression, chronic nonallopathic lesion of lumbar and cervical regions. Dr. Sharp prescribed Wellbutrin and Xanax (R. 451, 482). Dr. Sharp recommended Plaintiff exercise for her back, walk and diet (R. 451-52, 482-83).

On December 20, 2007, James Binder, M.D., completed a "Psychiatric Review Technique" of Plaintiff. Dr. Binder found Plaintiff was positive for affective disorder, which was listed as depressive disorder (nos), and anxiety-related disorders, which were listed as PTSD and "panic without agoraphobia" (R. 430, 433, 435). Dr. Binder found Plaintiff had mild restriction of daily activity; moderate difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and one or two episodes of decompensation (R. 440). There was no evidence for the establishment of the "C" criteria (R. 441). Dr. Binder reviewed the April, 2007, records from VCU Health System; the May and June, 2007, medical records from Henrico Area Mental Health Center; and records of Tina Fontenot, M.S. (R. 442).

Dr. Binder also completed a "Mental Residual Functional Capacity Assessment" of Plaintiff on December 20, 2007 (R. 444-46). Dr. Binder found Plaintiff was not significantly limited in any areas of the "Understanding and Memory" category and the "Sustained Concentration and Persistence" category (R. 444-45). As to Plaintiff's social interaction, Dr. Binder found Plaintiff was not significantly limited in her ability to ask simple questions or request assistance, to get along

with coworkers or peers without distracting them or exhibiting behavioral extremes, or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. As to Plaintiff's adaptation, Dr. Binder found Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others. Plaintiff was found to be moderately limited in her ability to travel in unfamiliar places or use public transportation (R. 445).

Dr. Binder found Plaintiff was credible, had "moderate social deficits as a result of her PTSD/panic," and "appear[ed] capable of learning and performing basic work-like tasks" (R. 446).

Plaintiff obtained a refill for Alprazolam from Dr. Sharp on January 2, 2008 (R. 448).

On February 15, 2008, Plaintiff presented to Pocahontas Memorial Hospital with low back pain (R. 484, 494, 499), which was caused by her "helping her father" (R. 487, 502). Plaintiff's examination was normal except for lumbar spine tenderness upon palpation and spasm at L3-L5 (R. 488, 503, 507). An x-ray of Plaintiff's lumbar spine showed degenerative disk changes at L4-5 (R. 492, 497). Plaintiff was medicated with Norflex (R. 489, 504).

On May 19, 2008, A. Rafael Gomez, M.D., completed a "Physical Residual Functional Capacity Assessment" of Plaintiff. Dr. Gomez found Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push/pull unlimited (R. 518). Plaintiff could never climb ladders, ropes or scaffolds and could never crawl. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch (R. 519). Plaintiff was limited in her reaching in all

16

directions, including overhead, but was unlimited in her ability to handle, finger and feel (R. 520). Plaintiff had no visual or communicative limitations (R. 520-21). Plaintiff was unlimited in her exposure to extreme cold and heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. He found Plaintiff should avoid concentrated exposure to vibration and hazards (R. 521). Dr. Gomez noted that "[n]ew medical evidence present[ed] symptoms and findings of the cervical and lumbar spine as previously" (R. 522). Dr. Gomez reviewed the February 24 and April 23, 2007, records from VCU Health System; September 27, 2007 and February, 2008, records from Pocahontas Memorial Hospital; the October, November, and December, 2007, records of Dr. Sharp (R. 524). Dr. Gomez noted Plaintiff was credible; he reduced her RFC to light (R. 522).

On May 22, 2008, Timothy Saar, Ph.D., completed a "Psychiatric Review Technique" of Plaintiff. He found Plaintiff had an affective disorder, which was depression, NOS, and an anxiety-related disorder, which was "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week" and "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" (R. 525, 528, 530). Dr. Saar found Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation (R. 535). Dr. Saar reviewed the records of Plaintiff's psychiatric hospitalization; May and June, 2007, records from Henrico Area Mental Health Center; the October and November, 2007, records of Dr. Sharp; the records of Ms. Fontenot; and Dr. Binder's December, 2007, evaluation (R. 537).

Dr. Saar completed a "Mental Residual Functional Capacity Assessment" of Plaintiff. He concluded that Plaintiff was not significantly limited in any area of the "Understanding and Memory"

category, except in her ability to understand and remember detailed instructions, for which she was moderately limited. Dr. Saar found Plaintiff was not significantly limited in any area of "Sustained Concentration and Persistence" category, except for her ability to carry out detailed instructions (R. 539-40). Dr. Saar found Plaintiff was not significantly limited in any area of the "Social Interaction" category, except for her ability to interact appropriately with the general public, for which she was moderately limited. Dr. Saar found Plaintiff was not significantly limited in any area of the "Adaption" category (R. 540). He noted the evidence did not "support severe limitations in F.C. due to a mental impairment. [Plaintiff] can learn and perform a variety to two-step commands involving simple instructions and minimal public contact" (R. 541).

On October 2, 2008, Plaintiff presented to Sarita Bennett, D.O., with a sebaceous cyst. Plaintiff stated Wellbutrin "helped" but she could not "afford" it. Plaintiff stated she "needed something to do at home." Dr. Bennett diagnosed sebaceous cyst and prescribed Cephalexin. Dr. Bennett discussed "stress management techniques" for relief of "panic disorder" symptoms (R. 548).

On November 12, 2008, Plaintiff reported to Dr. Bennett that she was "still having panic attacks" and she avoided "situations." Dr. Bennett prescribed Wellbutrin (R. 553).

Plaintiff was examined by Dr. Bennett on January 9, 2009, for pain in her left chest muscle, which she injured "'doing wood.'" Plaintiff stated she could not afford Wellbutrin. Dr. Bennett ordered a MRI of Plaintiff's cervical spine and prescribed Niravan for panic attacks (R. 552).

On March 17, 2009, Plaintiff was admitted to Pocahontas Memorial Hospital with dyspnea and mold exposure (R. 559). Plaintiff stated she had been "working in a house that was found to have mold." Her blood pressure was elevated; she was congested (R. 561). Plaintiff's chest x-ray was normal (R. 577).

Plaintiff presented to the emergency department of Pocahontas Memorial Hospital with elevated blood pressure on March 20, 2009 (R. 582).

On May 22, 2009, Plaintiff reported to Dr. Bennett that she would be traveling to Richmond, VA, to attend a baby shower and she needed a prescription for anxiety medication. Dr. Bennett provided samples of Ativan and prescribed Imipramine (R. 593).

On June 3, 2009, Dr. Bennett completed a "Physical Capacities Questionnaire and Assessment Form" at the request of Plaintiff's lawyer. Dr. Bennett noted she had treated Plaintiff on November 12, 2008, and January 09, 2009, April 22, 2009, and May 22, 2009; she diagnosed pain disorder, generalized anxiety and neck pain. Dr. Bennett did not identify any clinical findings or objective signs in support of the diagnosis. Dr. Bennett noted Plaintiff had realized "some improvement in anxiety" symptoms with medication. Plaintiff's prognosis was "limited" (R. 596). Dr. Bennett noted emotional factors contributed to the severity of Plaintiff's symptoms. Dr. Bennett listed Plaintiff's psychological conditions as anxiety and panic disorder and opined Plaintiff was "incapable of even 'low stress'" and her impairment would prevent her from working a full eight-hour workday. Dr. Bennett noted Plaintiff was "unable to cope with pressure to perform." Dr. Bennett opined that Plaintiff's pain constantly interfered with her ability to focus and concentrate and that her impairment would likely cause "'good days'" and "'bad days'" (R. 597). Plaintiff would likely be late for work four times a month and miss work four work days a month (R. 598).

Administrative Hearing

Plaintiff was questioned by her attorney and testified that, in April, 2007, she was in her home and "heard a gunshot." Her son broke down the door and told her to "get down." Her son "knocked [her] down and [they] crawled into the back room." She stated she had been shot, been

19

in the hospital for ninety minutes, spent the night with her sister, returned to her home, slept on the floor, paced, and "watched out the windows" (R. 30).

Plaintiff testified that one month later she had a "nervous breakdown" and "ended up in the hospital for a week." Plaintiff stated she left the hospital because she did not "have any insurance." Plaintiff testified she was not in treatment at the time of the administrative hearing because she did not have insurance (R. 31). Plaintiff testified she could not receive treatment at "Seneca" because her husband made "too much money," she had gotten a prescription from Dr. Sharp for Wellbutrin, but she could not afford it, and she was treated by Sheila Rose until she "went out of business." Plaintiff was treated by Dr. Bennett for a cyst on her back, panic attacks and to "get . . . some Wellbutrin" (R. 33). Plaintiff testified that an agreement was made with Davis Memorial Hospital for her to pay eighty percent of a MRI for her back, but she could not afford that (R. 34).

Plaintiff stated she moved to Marlington, West Virginia, from Richmond, Virginia, because it "was too hard," the person who shot her was never apprehended, and there were "too many people." Plaintiff testified she had panic attacks when in Richmond, which was in August, when "her son was shot" (R. 31). Plaintiff stated she only went "out . . . if her husband was with" her (R. 32). Plaintiff stated she shook when she got nervous or upset, which was when she would "go out" (R. 29). Plaintiff stated she cried daily; she had panic attacks daily, but, if she stayed in the house, she would "have them a couple of times a week, sometimes every day" (R. 35, 39).

Plaintiff testified she had two herniated disks in her back, deteriorating disk disease in her neck and back, and a pinched nerve in her neck, which caused her "collarbone to press up against [her] throat." Plaintiff stated she did not know "what else [was] wrong because [she had not] been to . . . doctor to get everything checked out" (R. 32).

Plaintiff testified she quit her job in golf course maintenance because "riding on the lawn mowers" and "bouncing and ajarring and up and down and the lifting . . . hurt her . . . middle and lower . . . back." Plaintiff testified her past relevant work included carpenter's helper, bridge builder, dump truck driver, school bus driver, pressman, manager of seafood department in grocery store, and parking deck supervisor at an airport (R. 36).

Plaintiff stated she stayed in her house, took care of her dogs, "go[t] on the computer and enter[ed] sweepstakes," watched television, "straightened up the house," shopped for "everything at one time . . . when [she knew] there[] [would] not . . . be a lot of people," and drove. Plaintiff stated she had panic attacks when she drove in traffic (R. 38). Plaintiff stated she had friends, but they did not go to Plaintiff's house "very often" because people "don't like" her dogs. Plaintiff stated she talked to her friends and sisters on the phone.

Plaintiff testified she did not like to talk about the shooting because it "upset[] her." Plaintiff testified her "thumbs lock up on" her and she had no strength in [her] arms." Plaintiff stated she dropped things and burned herself on the woodstove because when she "put[] the wood in" she did "not feel[] the burn until afterwards" (R. 37). Plaintiff testified she felt better when her husband was "around" because he made her feel safe (R. 39-40). Plaintiff testified she did not move her neck "if [she could] help it." Plaintiff stated it "pop[ped] and grind[ed]," which she did not like to hear and "it hurt." Plaintiff testified if she did "a whole lot at night," she could not sleep because her "collarbone pushe[d] in [her] throat when [she] lay a certain way." Plaintiff stated she did not sleep well when her husband was not home. Plaintiff testified she had experienced "some" psychiatric problems" prior to the shooting (R. 40). She had "suffered with depression all [her] life" because she was "molested as a child" and her father was an alcoholic and verbally abused her (R. 41). She

had functioned with her depressive symptoms; specifically, when she became depressed, she would be treated by her doctor with medication, but her son was diagnosed with diabetes and she put herself "on the back burner" because she had to "focus on taking care of him" (R. 41-42).

Plaintiff was questioned by the administrative law judge. Plaintiff testified her husband was employed as a pipe layer. Plaintiff stated her husband's annual income was $35,000.00 (R. 42).

The ALJ asked the following hypothetical question to the VE:

Let's presume we have a hypothetical person the same age, education and work history as is she, but the limitations are such that is indicated by a DDS (inaudible) a person because it's apparent in symptoms who will be limited to only occasionally lifting and carrying 20 pounds, frequently lift and carrying 10 pounds. Standing and or walking about six hours in an eight hour day, sitting about six hours in an eight hour day. Should never climb ladders, ropes, scaffolds. Only occasionally climb ramps and stairs. Only occasionally balance, stoop, kneel, crouch and never crawl. Has a moderate restriction to range of motion of right arm, shoulders and limited only in reaching, not handling nor feeling, not limited in handling, fingering or feeling. Should avoid concentrated exposure to vibration and hazards. And she has some moderate limitations from her mental impairment, but is able to learn and perform basic like work tasks with minimal contact with the public and co-workers. And with those type – would that be limiting her to simple, one, two-step commands and those type of limitations, are there any jobs that exist in the national economy that she's already done that she could still do? (R. 45).

The following answer was given and exchange occurred:

VE:   Your Honor, under that hypothetical she could do the work that she did as a cashier. Though it's – I would want to note that the moderate limitation in reaching – I'm not exactly sure how to deal with that, but I think that if I – in reading and trying to understand what the examiner was saying, that it seemed to be something that she could deal with for the most part. So she could do the work then of a cashier that she had done –

ALJ:  Well, a cashier would have, I would think substantial amount of contact with the public. . . .

VE:   I'm sorry. You're right. . . . Yeah. I – you're right. I had picked that up. I had failed to note that as I was thinking. Excuse me. She could not do the parking lot attendant's job, not the pay station supervisor, nor anything with

the cooking assembly. She could do the assembly position. That would not be with the public and that's also a sedentary job, light as she describes her work. And she could – for the most part do the work of a house cleaning, though there would – there is always going to be some contact with the person that does it. And that would be the extent of her past work that she might do (R. 46).

ALJ:    And she could do the assembler as she did it? I think you indicted it was done –

VE:    Yes, sir.

ALJ:    And are there any other jobs she could do with those limitations?

VE:    She could – at the light, unskilled exertional level she could do the work of a silver wrapper. . . . More than 100,000 within the national economy, more than 3,000 within the region, with our region being West Virginia and Virginia. Also one of the assembly positions there's some 376,000 of those nationally and just under 12,000 of those within the region . . . . (R. 47).

## Evidence Submitted Post-Hearing

Plaintiff, in her Motion for Judgment on the Pleadings and/or Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record, asserted that medical records from Seneca Health Services, dated between September and November, 2009, and an October 7, 2009, West Virginia Department of Health and Human Resources Finding of Disability and Disability Evaluation by Dr. Bennett were submitted to, but not considered by, the Appeals Council and not contained in the administrative record before this Court. Plaintiff attached them to her motion (D.E. 14-1, pp. 1-13; D.E. 14-2, pp. 1-10).

By letter dated December 16, 2009, and addressed to the Social Security Administration Appeals Council, Plaintiff submitted records from Seneca Health Services and requested that they "be made a permanent part of" her "claim file and utilized in rendering a favorable decision." Plaintiff asserts, in her cover letter to the Appeals Council, that the evidence was "relevant" to her

"appeal in that it goes to the finding that her psychiatric impairments were not as severe as alleged because she did not seek treatment." Plaintiff asserted she did not seek psychiatric treatment "because she lacked the financial resources" but that it had "since been determined that she qualifie[d] for medicaid and ha[d] sought treatment" (D.E. 14-1, p. 1). Plaintiff qualified for services from Seneca Health Services after she and her husband separated (Plaintiff's brief at p. 7).

Plaintiff presented to the Seneca Health Services on September 17, 2009, more than seven months after the administrative hearing was conducted and almost six weeks after the ALJ rendered his decision (R. 20, 23). A psychiatric diagnostic interview was conducted by Noel Jewell, M.D. Dr. Jewell noted Plaintiff "present[ed] voluntarily to Seneca Health Services, Inc., for initial psychiatric evaluation to render diagnosis and treatment recommendations." Plaintiff stated she experienced "extreme anxiety and depressive symptoms." Plaintiff stated she felt "very sad" and had "anxiety to the point that she [did] not want to leave her home." Plaintiff informed Dr. Jewell that she had been shot in 2007 and had suffered a nervous breakdown, for which she was hospitalized. Plaintiff stated she had experienced "uncontrolled" anxiety since that incident and that her "depression [was] worsening as she [felt] very sad and hopeless" (D.E. 14-1, p. 2).

Plaintiff reported she had attempted suicide at "age 12-13"; had degenerative disk disease, herniated disks and sciatica; was separated from her second husband; had a "history of nicotine dependence"; had been subjected to verbal and emotional abuse by her alcoholic father; had been raped at age 19 by her cousin; had been "sexually molested on many occasions by an aunt's husband's nephew, by a cousin, and by a friend of her father[]" (D.E. 14-1, p. 2).

Dr. Jewell's examination of Plaintiff revealed her behavior/attitude/demeanor were cooperative and appropriate; her speech had regular rhythm, rate, volume; her affect was depressed

and mood dysthymic; her thought process was "connected" and "logical"; her thought content was void of delusions or preoccupations; she had no hallucinations; she was alert and oriented, times four; her attention was satisfactory; her insight and judgment were intact; she had no suicidal or homicidal thoughts or plans; she was forward thinking and goal oriented (D.E. 14-1, pp. 2-3).

Dr. Jewell's diagnosis was for major depressive disorder, recurrent, moderate, and posttraumatic stress disorder. Dr. Jewell prescribed Wellbutrin and Klonopin (D.E. 14-1, p.3).

Plaintiff presented to Dr. Jewell on September 30, 2009, for follow up to her September 17, 2009, evaluation. Plaintiff informed Dr. Jewell that she wanted "to go up on the Wellbutrin because that's what she was on when she left the hospital and she was feeling much better." Plaintiff's behavior/attitude/demeanor were cooperative and appropriate; her speech had regular rhythm, rate, volume and non-pressured; her affect was broad and mood euthymic; her thought process was "connected" and "logical"; there was no evidence of delusions or preoccupations in her thought content; she had no hallucinations; she was alert and oriented, times four; her attention was satisfactory; her insight and judgment were intact; she had no suicidal or homicidal thoughts or plans; she was forward thinking and goal oriented. Plaintiff was diagnosed with bipolar affective disorder. Plaintiff's dosage of Wellbutrin was increased. Dr. Jewell noted Plaintiff's response to her treatment had been "good" (D.E. 14-1, p. 6).

On October 12, 2009, Plaintiff presented for individual therapy with Zed S. Weatherholt, M.A., L.S.W. Plaintiff reported having been shot in April, 2007, and a history of sexual, physical and verbal abuse as a child. Plaintiff was cooperative. Plaintiff's resistence to treatment was noted as mild to moderate. Plaintiff's mood "anxious with a stable affect." Plaintiff was oriented in all spheres; her recent and remote memories were intact; her insight was fair to good; her judgment

remained good. Plaintiff had no indication of "psychosis or thought disorder." Plaintiff had no suicidal or homicidal ideation and no "specific somatic complaints" (D.E. 14-1, p. 12).

On October 28, 2009, Plaintiff presented for a follow-up visit with Dr. Jewell, who noted Plaintiff's behavior/attitude/demeanor were cooperative and appropriate; her speech had regular rhythm, rate, volume and was non-pressured; her affect was full; her mood was euthymic; her thought process was "connected" and "logical"; her thought content was normal; she had no hallucinations; she was alert and oriented, times four; her attention was satisfactory; her insight and judgment were intact; she had no suicidal or homicidal thoughts or plans; she was forward thinking and goal oriented. Dr. Jewell diagnosed bipolar affective disorder. Dr. Jewell prescribed Wellbutrin and Geodon. Plaintiff informed Dr. Jewell that the Geodon made her muscle spasms worse. Dr. Jewell noted Plaintiff's "response to treatment has been good" (D.E. 14-1, p. 4).

On November 2, 2009, Plaintiff presented for outpatient therapy with Mr. Weatherholt. Plaintiff reported she had "done much better" since she had been taking medication for her symptoms and that the medication was working. Plaintiff used "her breathing" to manage her anxiety and panic (D.E. 14-1, p. 10). Plaintiff's resistence to treatment was noted as mild to moderate. Plaintiff was observed as being "anxious with a mildly labile affect." Plaintiff was oriented in all spheres; her recent and remote memories were intact; her insight was fair to good; her judgment remained good. Plaintiff had no indication of "psychosis or thought disorder." Plaintiff had no suicidal or homicidal ideation and no "specific somatic complaints" (D.E. 14-1, p. 10).

On November 23, 2009, Plaintiff presented for outpatient therapy with Mr. Weatherholt. Plaintiff reported she was "doing slightly better than" she had been, had used "the deep breathing to assist her with managing her panic attacks," and walked to treat her depression and anxiety.

Plaintiff reported she still experienced panic attacks but that "she [was] more functional than she was in the past." Plaintiff stated she would "continue to use the techniques of reality therapy to manage her anxiety and her depression" (D.E. 14-1, p. 8). Plaintiff was observed as being anxious with occasional sad mood and stable affect. Plaintiff was oriented in all spheres; her recent and remote memories were intact; her insight was fair to good; her judgment remained good. Plaintiff had no indication of "psychosis or thought disorder." Plaintiff had no suicidal or homicidal ideation and no "specific somatic complaints" (D.E. 14-1, p. 8).

By letter dated December 28, 2009, and addressed to the Social Security Administration Appeals Council, Plaintiff submitted a West Virginia Finding of Disability and a Disability Evaluation by Dr. Bennett, dated October 7, 2009, and requested that the evidence "be made a permanent part of" her "claim file and utilized in rendering a favorable decision." Plaintiff asserts, in her cover letter to the Appeals Council, that the evidence was "relevant" to her "appeal in that it goes to the finding that her psychiatric impairments were not as severe as alleged because she did not seek treatment." Plaintiff asserted she did not seek psychiatric treatment "because she lacked the financial resources" but that it had "since been determined that she qualifie[d] for medicaid and ha[d] sought treatment" (D.E. 14-2, p. 1). Plaintiff qualified for services from Seneca Health Services after she and her husband separated (Plaintiff's brief at p. 7).

On October 7, 2009, almost eight months after the administrative hearing and two months after the ALJ's decision, Dr. Sarita Bennett, completed West Virginia Department of Health and Human Resources Medical Review Team (MRT), General Physical (Adults) (D.E. 14-2, p. 6).

Dr. Bennett noted Plaintiff was referred to her on September 15, 2009. Plaintiff's "Statement of Incapacity/Disability" was for PTSD, depression, anxiety, degenerative joint disease,

and "psychiatric illness stated [Plaintiff] being shot in April 2007." Plaintiff speech and posture were normal and her gait was stable (D.E. 14-2, p. 6).

Upon examination, Dr. Bennett found Plaintiff's neck, lymphatic system, breasts, lungs, chest, heart, abdomen, neurologic examination, and veins were normal. Plaintiff's neurological examination was normal. Plaintiff was positive for decreased ranges of motion in her neck and lumbar region. Dr. Bennett noted Plaintiff's psychiatric examination was abnormal for PTSD, depression, and anxiety and that Plaintiff medicated with Klonopin and Wellbutrin. Plaintiff described her pain as chronic in her neck and back; she had headaches daily (D.E. 14-2, p. 7).

Dr. Bennett diagnosed bipolar disorder, PTSD, anxiety, and ADHD. Dr. Bennett opined that Plaintiff was unable to work full time at "customary occupation or like work . . . due to chronic pain and extreme severity of symptoms of mental illness, including intermittent explosive episodes, self mutilating behavior, exaggerated emotion response to stress and an inability to process other's perceptions of her due to limited intellectual ability: can react violently @ times to self and others." Dr. Bennett further opined that Plaintiff was totally and permanently disabled (D.E. 14-2, p. 7). Dr. Bennett concluded that Plaintiff "should be granted disability based on both physical diseases and chronic related mental illness. She is unable to follow the simplest of instructions, complete her ADL's or complete repetative (sic) tasks. She is unable to function appropriately [with] peers or authority figures as well" (D.E. 14-2, p. 8). Plaintiff attached the September 17, 2009, psychiatric evaluation of Dr. Jewell to Dr. Bennett's report; however, Dr. Bennett does not refer to the findings of Dr. Jewell as a basis for her opinions (D.E. 14-2, pp. 6-10).

On October 20, 2009, the "MRT" submitted a West Virginia Department of Health and Human Resources Mental Disability/Incapacity Evaluation relative to its recommendation as to

Plaintiff. A finding was made on November 30, 2009, by Dr. Clark, M.D. a psychiatrist. It was determined that, "[a]fter considering all information a decision has been made that the above client is mentally: Disabled – SSI-Related Medicaid 18/over" (D.E. 14-2, p.2). The reviewers noted that Plaintiff was not currently working, had a medically determinable impairment or combination of impairments that significantly limited her ability to do basic work activities, and met or equaled "the listing of impairments." The reviewers found "the case must be re-evaluated on 9/10 . . ." (D.E. 14-2, p. 3). Also on October 20, 2009, the "MRT" submitted a West Virginia Department of Health and Human Resources Disability/Incapacity Evaluation relative to its recommendation as to Plaintiff. A finding was made on November 30, 2009, by a review team leader and a reviewing physician. No physical disabilities were found (D.E. 14-2, pp. 4-5).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Kilbane made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011 (R. 12).

2. The claimant has not engaged in substantial gainful activity since April 28, 2007, the amended alleged onset date (20 CFR 404.1571 *et seq.*) (R. 12).

3. The claimant has the following severe impairments: degenerative disc disease; spondylosis; post-traumatic stress disorder; anxiety disorder with panic attacks; major depressive disorder (20 CFR 404.1520(c) (R. 12).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526) (R. 13).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with postural limitations in never balancing or crawling and occasionally climbing,

stooping, kneeling and crouching, manipulative limitations in reaching all directions, and environmental limitations in avoiding concentrated exposure to vibrations and hazards, as well (sic) moderate mental limitations with the ability to follow simple instruction and with limited contact with the public and co-workers (R. 14).

6.      The claimant is capable of performing past relevant work as a lock assembler and house cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565) (R. 19).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from April 28, 2007 through the date of this decision (20 CFR 404.1520(f) (R. 19).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws*

*v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.    The decision of the Commissioner should be remanded because the Appeals Council failed to consider new evidence that was material to the determination of disability (Plaintiff's brief at p. 7).

2.    The decision of the Commissioner should be reversed and remanded because it is not based on substantial evidence. The ALJ erred in relying entirely on the opinion of non-treating psychological consultants to determine that there were few restrictions imposed by Plaintiff's psychiatric impairments (Plaintiff's brief at p. 8).

3.    The decision of the Commissioner should be reversed because the ALJ discredited the testimony of Plaintiff regarding the severity of her impairments for not seeking treatment when the record repeatedly shows that she could not afford medical care (Plaintiff's brief at p. 12).

4.    The Commissioner erred in improperly relying upon the vocational expert's responses to an incomplete hypothetical question (Plaintiff's brief at p. 13).

The Commissioner contends:

1.    The Appeals Council reasonably did not consider the additional evidence submitted by Plaintiff that related to the period after the date of the ALJ's decision (Defendant's brief at p. 8).

2.    The ALJ reasonably evaluated the medical evidence of record when finding that Plaintiff did not have a disabling mental impairment (Defendant's brief at p.10).

3.    Substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not entirely credible (Defendant's brief at p. 13).

4. The ALJ's assessment of plaintiff's residual functional capacity reasonably accounted for the limitations arising from her mental impairments (Defendant's brief at p. 14).

## C. Appeals Council

Plaintiff argues that, in conformance with 20 C.F.R. § 404.970(b) and under *Wilkens v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93 (4th Cir. 1991) (holding that the Appeals Council is required to consider new and material evidence), the Appeals Council's failure to explain why it did not list the records from Seneca Center and the DHHR's disability report in its February 23, 2010, decision (R. 4) or include these documents "in the transcript produced by the Defendant for [Plaintiff's] . . . Appeal [sic] is evidence that it was not considered and merits a remand" (Plaintiff's brief at p. 8)[2]. Plaintiff attached the treatment records of Dr. Jewell, therapy notes from Mr. Weatherholt, and the disability report and findings from West Virginia Department of Health and Human Resources to her Motion for Judgment on the Pleadings and/or Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record (D.E. 14, 1-3; D.E. 14-1, 1-13; D.E. 14-2, 2-10).

-------

[2]It must be noted that the only relief Plaintiff seeks relative to the evidence attached to her Motion for Judgment on the Pleadings and/or Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record is that the case be remanded because the Appeals Council did not review the evidence or make it part of the record (D.E. 14, p. 1). Likewise, in Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings and/or Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record, she argues that her case should be remanded because the Appeals Council "failed to consider new evidence that was material to the determination of disability," which "merits a remand" (D.E. 15, pp. 7-8). Plaintiff does not move this Court to supplement the record with new the evidence attached to her Motion for Judgment on the Pleadings and/or Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record; Plaintiff does not move the Court to consider the evidence as new and material. *See Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).

Defendant argues that the Appeals Council is mandated to only "consider additional evidence submitted to it if that evidence satisfies [the] . . . criteria" in 20 C.F.R. 404.970(b). "The additional evidence must be: 1) new . . .; 2) material . . .; and 3) . . . relate to the time period on or before the date of the ALJ's decision. Here, the additional evidence . . . did not relate to the time period on or before the date of the ALJ's August 4, 2009, decision" (Defendant's brief at p. 9).

The undersigned finds both the Plaintiff's and Defendant's arguments are without merit.

The ALJ's decision was issued on August 4, 2009 (R. 7, 20). There is no record in the file as to the actual date Plaintiff received the notice of the ALJ's decision; however, on August 28, 2009, Plaintiff filed her "Request for Appeals Council Review of Administrative Law Judge Brian Kilbane's Unfavorable Decision" (R 90-94). The record also contains an undated "Request for Review of Hearing Decision/Order" signed by Plaintiff's counsel (R. 6). The evidence referenced by Plaintiff was not submitted to the Appeals Council at the time the request for review was filed on August 28, 2009 (R. 4, 6, 90-94, D.E. 14-1, pp. 1-13; D.E. 14-2, pp. 1-10). 20 C.F.R. § 404.968 provides the following guidance for submitting new evidence to the Appeals Council:

How to request Appeals Council review.

(a) *Time and place to request Appeals Council review.* You may request Appeals Council review by filing a written request. *Any documents or other evidence you wish to have considered by the Appeals Council should be submitted with your request for review.* You may file your request –

(1) Within 60 days after the date you receive notice of the hearing decision or dismissal (or within the extended time period if we extend the time as provided in paragraph (b) of this section);

. . .

(b) *Extension of time to request review.* You or any party to a hearing decision may ask that the time for filing a request for the review be extended. The request for an extension of time must be in writing. It must be filed with the Appeals Council, and it must give the reasons why the request for review was not filed within the stated

time period. If you show that you had good cause for missing the deadline, the time period will be extended. To determine whether good cause exists, we use the standards explained in 404.911. (Emphasis added.)

Additionally, the "Request for Review of Hearing Decision/Order" (Form HA-520) (Attachment 1), which Plaintiff submitted (R. 6) reads as follows:

If you have additional evidence submit it with this request for review. If you need addition time to submit evidence or legal argument, you must request an extension of time in writing now. If you request an extension of time, you should explain the reason(s) you are unable to submit the evidence or legal argument now. If you neither submit evidence or legal argument now nor within any extension of time the Appeals Council grants, the Appeals Council will take its action based on the evidence of record.

Plaintiff submitted treatment notes from Dr. Jewell and counseling notes from Mr. Weatherholt at Seneca Center and Dr. Bennett's disability evaluation and disability finding to the Appeals Council on December 16, 2009, one-hundred, thirty-four (134) days after the ALJ's decision and one-hundred and ten (110) days after Plaintiff filed her request for review with the Appeals Council (R., 6, 7, 20, 90-94, D.E. 14-1, pp. 1-13; D.E. 14-2, pp. 1-10).

Plaintiff was evaluated on September 17, 2009, by Dr. Jewell, forty-four (44) days after the ALJ's decision was issued and twenty (20) days after Plaintiff filed her request for review with the Appeals Council (R. 4, 6, 7, 20, 90-94, D.E. 14-1, p. 2). Plaintiff was again evaluated on September 30, 2009, by Dr. Jewell, fifty-seven (57) days after the ALJ's decision was issued and thirty-three (33) days after Plaintiff filed her request for review with the Appeals Council (R. 4, 6, 7, 20, 90-94, D.E. 14-1, p. 6). On October 7, 2009, sixty-four (64) days after the ALJ issued his decision and forty (40) days after Plaintiff filed her request for review with the Appeals Council, Dr. Bennett completed a West Virginia Department of Health and Human Resources Medical Review Team (MRT), General Physical (Adults) of Plaintiff (R. 4, 6, 7, 20, 90-94, D.E. 14-2, p. 6-10).

Plaintiff was counseled by Mr. Weatherholt on October 12, 2009, sixty-nine (69) days after the ALJ's decision was issued and forty-five (45) days after Plaintiff filed her request for review with the Appeals Council (R. 4, 6, 7, 20, 90-94, D.E. 14-1 p, 12). Plaintiff was evaluated by Dr. Jewell on October 28, 2009, eighty-five (85) days after the ALJ's decision was issued and sixty-one (61) days after Plaintiff filed her request for review with the Appeals Council (R. 4, 6, 7, 20, 90-94, D.E. 14-1, p. 4). Mr. Weatherholt counseled Plaintiff on November 2, 2009, ninety (90) days after the ALJ's decision was issued and sixty-six (66) days after the Plaintiff filed her request for review with the Appeals Council (R. 4, 6, 7, 20 90-94, D.E. 14-1, p. 10). Plaintiff underwent outpatient therapy with Mr. Weatherholt on November 23, 2009, one-hundred and eleven days (111) after the ALJ's decision and eighty-seven (87) days after Plaintiff filed her request for review with the Appeals Council (R. 4, 6, 7, 20, 90-94, D.E. 14-1, p. 8). On November 30, 2009, one-hundred and eighteen (118) days after the ALJ's decision was issued and ninety-four (94) days after Plaintiff filed her request for review with the Appeals Council, Dr. Clark made a disability finding as to Plaintiff's mental limitations and a finding of no disability was made as to Plaintiff's physical condition (R. 4, 6, 7, 20, 90-94, D.E. 14-2, pp. 3, 4-5).

Plaintiff did not submit any new evidence for review with her request to the Appeals Council; Plaintiff filed only the HA-520 (R. 6) and a memorandum (R. 90-94) on August 28, 2009. The evidence in question was not even in existence when Plaintiff filed her request. Based on the language in 20 C.F.R. § 404.968, *supra*, the Appeals Council was not required to consider this evidence when it was submitted on December 16, 2009, and it was not required to include it in the record. Precedent for this standard in the Northern District of West Virginia can be found in *Allen v. Astrue*, 2010 WL 2196530, *7, an unpublished opinion, in which District Judge Frederick P. Stamp, Jr., opined as follows:

The plaintiff argues that the Appeals Council failed to consider the . . . additional evidence she submitted on appeal because the additional evidence . . . [is] not in the record and the Appeals Council did not discuss the evidence . . . in its denial for review. . . . [T]he Appeals Council had no obligation to review the proposed "new" material because the plaintiff did not submit the evidence within sixty days of the ALJ's decision. *See* 20 C.F.R. § 404.968 (requiring that any documents for the Appeals Council to consider be submitted with the request for review, to be filed within sixty days of the ALJ's decision, unless the plaintiff files a written request for an extension of time). The plaintiff's counsel did not submit the new evidence with the request for review . . . . Further the plaintiff's counsel did not file a written request for an extension of time, giving the reasons for the late filing and showing good cause, which the regulations require. *Id.* Further, the form the plaintiff used for requesting review by the Appeals Council advised the plaintiff that she was to submit additional evidence with the request for review and that if she needed extra time to submit additional evidence, it was the plaintiff's counsel's responsibility to submit a written request for an extension along with an explanation for why the extension was necessary. . . .

The case before this Court is analogous with *Allen, supra.* Plaintiff in this case did not submit new evidence with the request for review and she did not seek an extension of time to do so. Plaintiff filed her request for review and memorandum on August 28, 2009, twenty-four (24) days after the ALJ's decision was issued and twenty (20) days before the first piece of new evidence was generated (R. 6, 90-94). It is unfortunate that Plaintiff did not delay the filing of her request for review with the Appeals Council until the first part of October, 2009, (October 3, 2009, was the sixtieth day after the date of the ALJ's decision) or seek an extension of time beyond that deadline in which to file her request for review and new evidence. Had she taken either of these actions, she would have been able to submit the evidence.

Regardless of when the evidence was generated or when Plaintiff filed her request for review and memorandum with the Appeals Council, the Appeals Council is required to consider only that evidence that is submitted with the request for review. The evidence referenced above and attached to Plaintiff's Motion for Judgment on the Pleadings and/or Plaintiff's Motion to Remand for the

Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record was not submitted by Plaintiff to the Appeals Council in conformance with 20 C.F.R. § 404.968 or with this District's standards, as espoused in *Allen*, *supra* at 7; therefore, the Appeals Council was not required to consider the evidence that was mailed to it on December 16, 2009, or include it in the record. The undersigned finds the Appeals Council did not err and this matter should not be remanded.

### D. Opinion Evidence

Plaintiff asserts the ALJ's decision to rely on the opinion of the state-agency physician relative to Plaintiff's psychiatric limitations is not supported by substantial evidence. The Defendant argues that the ALJ's decision is supported by substantial evidence.

Relative to opinion evidence, the Fourth Circuit has held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983).

*Craig v. Chater*, 76 F. 3d 585, 589 (1996).

20 C.F.R. § 404.1527(d) reads as follows:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at

> the treatment the source has provided and at the kinds
> and extent of examinations and testing the source has
> performed or ordered from specialists and
> independent laboratories.
>
> (3) *Supportability*. The more a medical source presents relevant
> evidence to support an opinion particularly medical signs and
> laboratory findings, the more weight we will give that opinion. . . .
>
> (4) *Consistency*. Generally, the more consistent an opinion is with
> the record as a whole, the more weight we will give to that opinion.
>
> (5) *Specialization.* We generally give more weight to the opinion of
> a specialist about medical issues related to his or her area of specialty
> than to the opinion of a source who is not a specialist.

In the instant case, the ALJ found the following:

As for the opinion evidence, the undersigned has considered the opinions of the DDS medical consultants, who opined that the claimant is able to perform light work with postural limitations in never balancing or crawling and occasionally climbing, stooping, kneeling and crouching, manipulative limitations in reaching all directions, and environmental limitations in avoiding concentrated exposure to vibrations and hazards (Ex. 24F), as well as the DDS psychological assessments that the claimant is moderately limited but can learn and perform a variety of two-step commands involving simple instruction and minimal public contact (Ex. 26F), and that she is capable of learning and performing basic work-like tasks (Ex. 11F). The undersigned finds that these opinions are consistent with the credible evidence of record. Thus, the undersigned gives great weight to the DDS medical and psychological opinions (R. 18).

The records indicate the claimant was treated by Sheila Rose, M.S., for post-traumatic stress symptoms as well as depressive symptoms from December 2007 to May 2008; however, there is only one psychological evaluation from this psychologist dated December 2007. . . . (Ex. 21F) (R. 16).

Consideration has been given to Dr. Sharp; however, he stated that he had only seen the claimant once before, that he had not reviewed the claimant's medical records, that the claimant had not seen an orthopedic or psychological consultation, that his examination was cursory at best, and that he was unable to perform a disability examination on orthopedic problems without a definitive diagnosis (Ex. 5F). Therefore, Dr. Sharp's opinion is given little weight (R.18).

The undersigned has considered Ms. Fontenot's opinion and gives it partial weight to the extent that it is consistent with the above-stated residual functional capacity (Ex. 6F). Consideration has also been given to Dr. Bennett's opinion; however, the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and the treatment notes indicate a lack of objective medical evidence supporting Dr. Bennett's opinion (Exs. 23F, 29F, 30F, 33F). Moreover, Dr. Bennett's opinion dealing primarily with the claimant's mental impairments is outside her area of expertise, as she is a primary care physician and not a mental health specialist (Ex. 33F) (R. 18).

As noted above, the ALJ considered the opinions of Drs. Sharp and Bennett, Ms. Fontenot and Ms. Rose as to limitations caused by Plaintiff's psychiatric condition in accord with 20 C.F.R. § 404.1527(d). Specifically, the ALJ considered the examining and treatment relationships of Dr. Sharp as to Plaintiff. The ALJ noted Plaintiff first visited Dr. Sharp in October, 2007, and last visited him in December, 2007. Plaintiff was also examined once in November, 2007, by Dr. Sharp (R. 16). The ALJ noted Dr. Sharp wrote that he had only "seen the [Plaintiff] once before the disability examination which was cursory at best, had no records of any account, and that there [was] no . . . psychiatric consultations (R. 16, 18). The ALJ addressed the supportability of Dr. Sharp's diagnoses of situational depression by noting it was not supported by any psychiatric evaluation (R. 16). Dr. Sharp's December, 2007, diagnosis of chronic panic was based on Plaintiff's reports of depression, PTSD, and panic attacks and her being "tearful and in depressed mood" (R. 449). Dr. Sharp was not a psychiatric specialist; indeed, it was he who wrote that he was "only a family practice physician" (R. 406). The ALJ's assignment of "little weight" to the opinion of Dr. Sharp is supported by substantial evidence (R. 18).

Plaintiff next contends the ALJ erred in rejecting the opinions of Dr. Bennett as to

limitations caused by Plaintiff's psychiatric symptoms.[3] The ALJ sufficiently evaluated Dr. Bennett's opinions and iterated the reasons he did not rely on them. He found the Dr. Bennett's opinions were not well supported because they were based "heavily on the subjective report of symptoms and limitations provided by" the Plaintiff and that her "treatment notes indicate[d] a lack of objective medical evidence" (R. 18). Dr. Bennett did not complete any mental evaluations of Plaintiff; her opinions were not supported by one. The ALJ considered the treating and examining relationships to Plaintiff of Dr. Bennett and noted Dr. Bennett treated Plaintiff three times from October, 2008, to January, 2009, and once in April, 2009. He noted Dr. Bennett diagnosed panic attacks based upon Plaintiff's statements that she had panic attacks (R. 17). The ALJ also addressed Dr. Bennett's medical qualifications as to psychiatric conditions by noting that "Dr. Bennett's opinion dealing primarily with the claimant's mental impairments is outside her area of expertise, as she is a primary care physician and not a mental health specialist (Ex. 33F)" (R. 18). The ALJ's decision as to the opinion of Dr. Bennett is supported by substantial evidence.

Plaintiff argues that Ms. Rose's opinions that Plaintiff was having "significant difficulty functioning on a daily basis" and diagnosis of PTSD, major depressive disorder, and borderline personality disorder should have been assigned weight because they were consistent with the

_____

[3]Even though Plaintiff only limited her argument to the ALJ's findings as to Plaintiff's psychiatric symptoms and limitations, Plaintiff noted that Dr. Bennett's findings regarding her physical limitations were supported by objective evidence, specifically an August 6, 2004, MRI of Plaintiff's lower spine and a September 27, 2007, x-ray of Plaintiff's cervical spine (Plaintiff's brief at p. 10). The undersigned finds that Dr. Bennett did not consider the results of those medical tests. In Section 6 of the Physical Capacities Questionnaire and Assessment Form, Dr. Bennett did not identify either the MRI or x-ray as medical tests she reviewed and on which she relied in making her finding (R. 596). The DDS physician, who completed the May, 2008, Physical Residual Functional Report and to whose opinion the ALJ gave great weight, considered the September 27, 2007 cervical spine x-ray in making his assessment (R. 524).

opinions and diagnoses of Drs. Sharp and Bennett (Plaintiff's brief at p. 12). The ALJ, in his decision, noted the limited examining and treatment relationship of Ms. Rose to Plaintiff. He considered Ms. Rose "reported that she saw the claimant for psychological services multiple times between December 2007 and May 2008," but only one record – the December, 2007 one – was submitted (R. 16, 17-18). Ms. Rose did not provide a longitudinal picture of Plaintiff's symptoms or limitations caused therefrom (R. 16-18). Ms. Rose based her diagnoses on Plaintiff's reports of "avoiding people and crowds, difficulty sleeping and concentrating, and withdrawing from people and activities" during the first, and only reported, visit; her diagnoses were not supported by any mental status examination or psychological examination or profile (R. 16). Substantial evidence supports the ALJ's decision as to the opinions of Ms. Rose.

Plaintiff asserts that the ALJ did "not address which of [Ms. Fontenot's] findings he accept[ed] and which he reject[ed]" (Plaintiff's brief at p. 11). As to the opinion of Ms. Fontenot, the ALJ gave "partial weight to the extend that it is consistent with the above-stated" RFC (R. 18). The ALJ's RFC was for "moderate mental limitations with the ability to follow simple instruction and with limited contact with the public and co-workers" (R. 14). The following findings by Ms. Fontenot are consistent with the ALJ's RFC: motivated attitude/behavior; oriented times four; depressed mood; tearful affect; normal thought process and content; normal perception; psychomotor behavior was within normal limits; normal judgment; mildly deficient immediate memory; moderately deficient recent memory; moderately deficient remote memory; normal concentration; normal persistence; mildly slow pace; and normal social functioning (R. 417). Plaintiff's assertion that the limitations noted by Ms. Fontenot support Dr. Bennett's opinion that Plaintiff was "incapable of even low stress, could not handle pressure to perform and would miss more than four

days a month due to her panic disorder, generalized anxiety disorder and neck pain" is unsupported by the above noted findings of Ms. Fontenot. The ALJ's decision to assign partial weight to the opinions and findings of Ms. Fontenot is supported by substantial evidence.

Finally, the ALJ gave "great weight" to the opinion of the DDS physician (R. 18). The May 22, 2008, opinion of Dr. Saar, a state-agency psychologist and an expert in Social Security disability evaluations should have been evaluated and considered by the ALJ.

S.S.R. 96-6p reads, in part, as follows:

> Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.
>
> . . .
>
> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Unlike Dr. Sharp, Dr. Bennett, Ms. Rose, and Ms. Fontenot, Dr. Saar evaluated the mental health treatment records from Henrico Area Mental Health Center and Plaintiff's psychiatric records from CJW Medical Center. Dr. Saar evaluated the treatment notes from Dr. Sharp; the report of the consultative examination of Ms. Fontenot; and the December, 2007, evaluation of Ms. Rose. Dr.

Saar considered Plaintiff's most recent ADL's and those from 2007 (R. 537-38). Specifically, Dr. Saar considered Plaintiff's Function Report, wherein she wrote she "let dog out, watch tv, cleans, feed lizard, cooks, maintain her own personal hygiene except w/pain due to problems with her knees, rt arm[] and back, cut grass when can, goes out only when have to, can go out alone but does not like too [sic], drives shops, handle finances, reads, listen to music, talk on phone and [worked on] computer, her attention span depends on what she is doing, some problems reported in follow written/spoken instructions" (R. 537). Dr. Saar also considered the statements Plaintiff made to Ms. Fontenot, which included her being able to "clean house, does grooming, take care of lizard and dogs, reported that goes out of house when her husband is home or unless she has an appointment, otherwise she does not leave her home" (R. 537). Dr. Saar, in formulating his opinion, also considered Plaintiff's "updated ADLs," which were she "drops things when going to store, doesn't like to go out for fear of panic attacks, doesn't drive alone, doesn't like to shop, stutters, not cooking any more, can't concentrate long enough to read, doesn't finish things, very fearful" (R. 537). This review of the pertinent records as to Plaintiff's psychiatric symptoms and treatment therefor and Plaintiff's own statements about what she could do provided Dr. Saar the opportunity to make a thorough and comprehensive finding as to Plaintiff's limitations. His finding that Plaintiff was "moderately limied (sic) . . . but the evidence [did] not support severe limitations in F.C. due to a mental impairment. [Plaintiff] can learn and perform a variety to two-step commands involving simple instructions and minimal public contact" is supported by the records he considered (R. 541).

The ALJ's decision to give great weight to the opinion of Dr. Saar is supported by substantial evidence.

## E. Credibility

Plaintiff next argues that the ALJ found her testimony not credible because her "treatment

history [had] significant gaps" (Plaintiff's brief at p. 12). Additionally, Plaintiff asserts that the ALJ

"mis-characterize[d]" Plaintiff's statements in her October 9, 2007, Function Report (Plaintiff's brief

at p. 13). Defendant asserts that substantial evidence supports the ALJ's credibility finding.

The Fourth Circuit mandated the following protocol relative to the consideration and analysis

of an individual's complaints of pain:

. . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). *Craig, supra* at 594.

Additionally, 20 C.F.R. §404.1529(c)(3) reads as follows:

(c) *Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work—*

> > (3) *Consideration of other evidence.* Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical

evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;

> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

> . . .

A review of the record shows the ALJ complied with the mandates of *Craig, supra*, and 20 C.F.R. §404.1529(c)(3). In his decision, the ALJ wrote the following:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity (R. 17).

Although the claimant has received treatment for the allegedly disabling

impairments, that treatment has been essentially routine and conservative in nature. The records indicate that she has not been prescribed any medication for pain since December 2007 (Ex. 12F). The claimant rejected other forms of medication besides Xanax for anxiety attacks without even attempting to take them because of a potential side effect (Ex. 3F). There is also evidence that the claimant has not been entirely compliant in taking prescribed medications; Dr. Bennett noted that medications gave some improvement in the claimant's anxiety, but the claimant reported multiple times that she was not taking her medication as prescribed (Exs. 3F, 6F, 12F, 33F) (R. 17).

The record reflects significant gaps in the claimant's history of treatment. With an exception for one emergency room visit for neck pain, there is no evidence that the claimant sought treatment for any impairment between June and October 2007. In addition, though Ms. Rose reported that she saw the claimant for psychological services multiple times between December 2007 and May 2008, there is only one record for December 2007 visit; with the exception of one emergency room visit for back pain in February 2008, and two emergency room visits in March 2008 for mold exposure and hypertension, the claimant's next treatment visit was not until October 2008.[4] These gaps in the claimant's history of treatment indicate the claimant's impairments are not as severe as she alleges (R. 17-18).

The claimant alleges severe limitations caused by her impairments; however, she reported preparing her own meals daily and preparing complete meals every other weekend for her husband and/or her sons, washing dishes, cleaning the house, doing laundry for herself and for her husband when he is at home, mowing the yard, caring for dogs and lizards, driving and grocery shopping (Ex. 4E). The claimant also reported that she enjoys physical activity, reading, fishing and window shopping (Ex. 3F). These activities are inconsistent with the severity of the impairments alleged by the claimant. In addition to the claimant's reported daily activities, the medical records indicate the claimant was exposed to mold while working in a house found to have mold by the health department (Ex. 31F). The claimant also reported plans to travel a significant distance in April 2009 (Ex. 32F). These activities indicate the claimant is not as impaired as is alleged (R. 18).

As noted above and in the ALJ's complete decision, in addition to addressing the location, duration, frequency and intensity of Plaintiff's pain; precipitating and aggravating factors and other factors relative to her functional limitations; and measures used to treat her pain (R. 12-18), the ALJ

_____

[4]The ALJ incorrectly notes Plaintiff sought medical treatment at emergency rooms twice in March 2008; Plaintiff sought that care in March, 2009 (R. 18, 559, 582)

addressed the treatment Plaintiff received, the medication she used to alleviate her symptoms, and her activities of daily living.

Plaintiff asserts she "consistently sought treatment she could afford" (Plaintiff's brief at p. 12). In *Gordon v. Schweiker*, 725 F.2d 231, 237 (1984), the Fourth Circuit held that "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him."

SSR 96-7p, however, reads the ". . . explanations provided by the individual [regarding his lack of treatment] may provide insight into the individual's credibility. For example: . . . the individual may be unable to afford treatment and may not have access to free or low-cost medical care . . . ."

Plaintiff stated to Ms. Rose, during the December, 2007, visit that she did not receive counseling because her husband "made too much money for her to qualify for services from the local mental health center . . ." (R. 511). Additionally, Dr. Liverman noted Plaintiff would "not qualify for indigent program with family income" (R. 387). In response to Plaintiff's statements at the administrative hearing that she could not afford Wellbutrin or partial payment of a medical test, the ALJ asked Plaintiff about her income; she testified her husband was a pipe layer and he earned between $30,000 and $35,000 per year (R. 42). Although the undersigned sympathizes with Plaintiff's position that she could not afford medications or medical tests and that she did not qualify for free or cost-reduced services because of her income, the undersigned does not find that the ALJ committed reversible error by considering Plaintiff's lack of significant treatment in evaluating her credibility regarding her pain and other symptoms. Furthermore, the ALJ's decision relative to his decision that Plaintiff's treatment was "essentially routine and conservative in nature," that there

were "gaps . . ." in her "history of treatment," and that she had not been "entirely compliant in taking prescribed medications" is based on his extensive evaluation of the whole record (R. 17-18).

The ALJ noted Plaintiff sought treatment once from June to October, 2007; the record supports this finding (R. 17, 393, 464). The ALJ noted that Plaintiff sought treatment at an emergency rooms in February, 2008, and not again until October, 2008 (R.17-18, 484-89, 494-504, 548). The ALJ correctly notes there in only one record from Ms. Rose as to the psychological services she provided Plaintiff. The record of evidence contains December, 2007, office notes from a counseling session conducted by Ms. Rose of Plaintiff; a notation in the record reads that Ms. Rose counseled Plaintiff from December, 2007, and May, 2008 (R. 17-18, 509-13, 514). The ALJ considered Plaintiff's in-patient psychological treatment. He noted Plaintiff was discharged after five days of care and that "her discharge summary indicat[ed] the claimant's readiness for discharge, that she was feeling less anxious overall, and that she was future-oriented and less frightened about going home (R. 15). A review of that record shows that, even though Plaintiff was "concerned about money and other stressors," she "indicated a readiness for discharge" (R. 264).

The ALJ noted that Plaintiff was last prescribed pain medication by Dr. Sharp in December, 2007 (R. 17, 449-52). The ALJ considered the medical records from Henrico Area Mental Health Center. While being counseled there, Plaintiff stated she was "unable to afford Wellbutrin." A "more affordable" medication, bupropion, was substituted for Wellbutrin, and Plaintiff reported one month later that she experienced "continued but decreased anxiety attacks" (R. 16). Plaintiff was informed that Wellbutrin was not the treatment "of choice fr PTSD," but Plaintiff stated she did not "want to take anything which [would] affect her sex drive" (R. 16, 384) The ALJ considered that Plaintiff requested Xanax, but the psychiatrist refused to prescribe that medication and offered an

49

alternative; Plaintiff rejected that medication because it had the potential of making her sleepy (R. 16). On November 1, 2007, Plaintiff told Ms. Fontenot that she was not medicating with Xanax or taking any medication for anxiety; however, on October 3, 2007, Dr. Sharp had prescribed Xanax (R. 17, 408, 416). The ALJ's finding that Plaintiff's medical treatment was routine and conservative and that she was not compliant in taking her "medication as prescribed" (R. 17) is supported by substantial evidence.

As to Plaintiff's assertion that the ALJ "mis-characterized" Plaintiff's activities of daily living, the undersigned finds the ALJ thoroughly and correctly evaluated and weighed Plaintiff's statements. As noted by the ALJ, Plaintiff, in her October, 2007, Functional Report, wrote she prepared her own meals and prepared "complete meals every other weekend for her husband and/or her sons," washed dishes, cleaned the house, did laundry for herself and husband "when he [was] at home," mowed the yard, cared for dogs and a lizard, drove and grocery shopped (R. 18). The evidence of record shows that Plaintiff qualified her activities of daily living as follows: 1) she prepared soups and sandwiches for her meals and she only cooked for herself when she felt like eating (R. 150, 152); 2) she cleaned the house, but not in one day (R. 152); 3) cooked complete meals for her husband, which took "a couple hours" to finish (R. 152); 4) when she cut the grass, that was the only chore she could accomplish that day (R. 152); 5) cared for her pets, which included bathing the dogs, but not walking them as she used to do (R. 151); 6) drove, which she did alone (R. 153); and grocery shopped, which she did when she needed items (R. 153). Plaintiff did perform these activities of daily living, at a certain pace that accommodated her needs. The ALJ did not mischaracterize this fact. Additionally, there are contradictions within that Functional Report. Plaintiff wrote that she no longer went outside, could not "be around alot (sic) of people," could not

go into stores, and could not walk "down a public street" (R. 151). Plaintiff, however, also wrote, she left the house and drove "alone" and that she shopped for groceries (R. 153).

Plaintiff also reported to the counselor at Henrico Area Mental Health Center that she fished, read, enjoyed physical activities, and window shopped (R. 18, 378). Plaintiff could read a novel and use the computer. Physical activity which Plaintiff undertook included "working in a house," attending a baby shower in Virginia, and "doing wood" (R. 17, 18, 552). The ALJ also considered that Plaintiff reported, upon admission as an in-patient to CJW Medical Center that she cared for all her activities of daily living (R. 15). The ALJ noted Plaintiff told Dr. Bennett, in October, 2008, that she "needed something to do at home" (R. 17).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984).

The ALJ's credibility analysis of Plaintiff's statements and his decision that Plaintiff's activities are inconsistent with the severity of the impairments she alleges are supported by substantial evidence.

### F. Hypothetical

Plaintiff asserts that the ALJ erred in improperly relying upon the vocational expert's response to an incomplete hypothetical question. Specifically, Plaintiff argues that the minimized the effects of Plaintiff's PTSD and panic attacks in his hypothetical in that the "only restrictions imposed were moderate limitations with the ability to follow simple instruction and limited contact with the public and co-workers" and that the hypothetical question "posed to the vocational expert [did] not address her ability to perform a job while having a panic attack or the affect frequent panic

attacks would have on her absenteeism" (Plaintiff's brief at p. 14). Defendant contends that the

ALJ's RFC reasonably accounted for the limitations arising from Plaintiff's mental impairments.

The ALJ's hypothetical question to the VE was as follows:

> Let's presume we have a hypothetical person the same age, education and work history as is she, but . . . . has some moderate limitations from her mental impairment, but is able to learn and perform basic like work tasks with minimal contact with the public and co-workers. And with those type – would that be limiting her to simple, one, two-step commands and those type of limitations, are there any jobs that exist in the national economy that she's already done that she could still do? (R. 45).

In *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great

latitude in posing hypothetical questions" and need only include limitations that are supported by

substantial evidence in the record. If the ALJ poses a hypothetical question that accurately reflects

all of the claimant's limitations, the VE's response thereto is binding on the Commissioner.

*Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987).

The ALJ's hypothetical noted Plaintiff had "moderate limitations from her mental

impairment, but [Plaintiff] is able to learn and perform basic like work tasks with minimal contact

with the public and co-workers. And with those type – would that be limiting her to simple, one,

two-step commands and those type of limitations"; these limitations were adequate to accommodate

Plaintiff's PTSD and panic attacks in that they are supported by the record.

In formulating the hypothetical question and RFC, the ALJ relied on the opinion of Dr. Saar

and, to some extent, the opinion of Ms. Fontenot. Neither of these mental health professionals

opined that Plaintiff's panic attacks would interfere with or cause her to be absent from work. Even

with Dr. Saar's finding that Plaintiff had recurrent, severe panic attacks and recurrent and intrusive

recollections of a traumatic experiences, he opined that Plaintiff had mild restrictions of activities

of daily living, mild difficulties in maintaining concentration, persistence, and pace, and moderate difficulties in social functioning (R. 18, 530, 535). Dr. Saar further found Plaintiff could learn and could perform a "variety to two-step commands involving simple instructions and minimal public contact" (R. 541). Even though Plaintiff reported to Ms. Fontenot that she did not "go out of the house often because she does not like to be around crowds," felt "safer" in the upstairs of her home, left the house when her husband accompanied her, and did not leave her home unless she had an appointment, Ms. Fontenot found Plaintiff's social functioning was within normal limits. Her behavior was motivated; her concentration was within normal limits; her persistence was within normal limits; her pace was only mildly slow; her insight was fair; her thought process and content were within normal limits; her attitude and behavior were motivated; her judgment was within normal limits; and her prognosis was "fair with appropriate psychological and medical intervention" (R. 18, 417-18). These findings and opinions support the ALJ's hypothetical that the jobs Plaintiff could do include "moderate limitations from her mental impairment, . . . able to learn and perform basic like work tasks with minimal contact with the public and co-workers" R. 45).

Additionally, the ALJ's hypothetical is supported by the findings of Dr. Binder, who opined, on December 20, 2007, in a "Psychiatric Review Technique" of Plaintiff, that she was positive for PTSD and "panic without agoraphobia" (R. 433, 435). Dr. Binder found Plaintiff had mild restriction of daily activity; moderate difficulty in maintaining social functioning; and mild difficulty in maintaining concentration, persistence, or pace (R. 440). In Dr. Binder's "Mental Residual Functional Capacity Assessment" of Plaintiff, Dr. Binder found Plaintiff was not significantly limited in her ability to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or to maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. As to Plaintiff's adaptation, Dr. Binder found Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others (R. 445). Dr. Binder found Plaintiff had "moderate social deficits as a result of her PTSD/panic," and "appear[ed] capable of learning and performing basic work-like tasks" (R. 446).

The undersigned finds the ALJ included all the mental limitations that were supported by the record in his hypothetical question to the VE.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned finds the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence and, accordingly, recommends the Defendant's Motion for Summary Judgment be **GRANTED** and the Plaintiff's Motion for Judgment on the Pleadings and/or Motion to Remand for the Consideration of Evidence Submitted to the Appeals Council but not Contained in the Administrative Record be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __9__ day of March, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

SOCIAL SECURITY ADMINISTRATION/OFFICE OF DISABILITY ADJUDICATION AND REVIEW

Form Approved
OMB No. 0960-0277

# REQUEST FOR REVIEW OF HEARING DECISION/ORDER

**(Do not use this form for objecting to a recommended ALJ decision.)**
*(Either mail the signed original form to the Appeals Council at the address shown below, or take or mail the signed original to your local Social Security office.)*

See Privacy Act Notice

| 1. CLAIMANT | 2. WAGE EARNER, IF DIFFERENT |
|---|---|
| 3.SOCIAL SECURITY CLAIM NUMBER<br><br> - - | 4. SPOUSE'S NAME AND SOCIAL SECURITY NUMBER<br>*(Complete ONLY in Supplemental Security Income Case)* |

5. I request that the Appeals Council review the Administrative Law Judge's action on the above claim because:

_____

_____

_____

## ADDITIONAL EVIDENCE

If you have additional evidence submit it with this request for review. If you need additional time to submit evidence or legal argument, you must request an extension of time In writing now. If you request an extension of time, you should explain the reason(s) you are unable to submit the evidence or legal argument now. If you neither submit evidence or legal argument now nor within any extension of time the Appeals Council grants, the Appeals Council will take its action based on the evidence of record.

**IMPORTANT: Write your Social Security Claim Number on any letter or material you send us.**

SIGNATURE BLOCKS: You should complete No. 6 and your representative (if any) should complete No. 7. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 7.

**I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge.**

| 6. CLAIMANT'S SIGNATURE | DATE | 7. REPRESENTATIVE'S SIGNATURE | ☐ ATTORNEY<br>☐ NON-ATTORNEY |
|---|---|---|---|
| PRINT NAME | | PRINT NAME | |
| ADDRESS | | ADDRESS | |
| (CITY, STATE, ZIP CODE) | | (CITY, STATE, ZIP CODE) | |
| TELEPHONE NUMBER<br>( ) - | FAX NUMBER<br>( ) - | TELEPHONE NUMBER<br>( ) - | FAX NUMBER<br>( ) - |

### THE SOCIAL SECURITY ADMINISTRATION STAFF WILL COMPLETE THIS PART

8. Request received for the Social Security Administration on _____ by: _____
(Date)        (Print Name)

(Title)        (Address)        (Servicing FO Code)        (PC Code)

9. Is the request for review received within 65 days of the ALJ's Decision/Dismissal?  ☐ Yes  ☐ No

10. If "No" checked:  (1) attach claimant's explanation for delay; and
(2) attach copy of appointment notice, letter or other pertinent material or information in the Social Security Office.

| 11. Check one: | 12. Check all claim types that apply : |
|---|---|
| ☐ Initial Entitlement<br>☐ Termination or other | ☐ Retirement or survivors (RSI)<br>☐ Disability-Worker (DIWC)<br>☐ Disability-Widow(er) (DIWW)<br>☐ Disability-Child (DIWC)<br>☐ SSI Aged (SSIA)<br>☐ SSI Blind (SSIB)<br>☐ SSI Disability (SSID)<br>☐ Title VIII Only (SVB)<br>☐ Title VIII/Title XVI (SVB/SSI)<br>☐ Other - Specify: _____ |

APPEALS COUNCIL
OFFICE OF DISABILITY ADJUDICATION AND
REVIEW, SSA
5107 Leesburg Pike
FALLS CHURCH, VA 22041 - 3255

**TAKE OR SEND ORIGINAL TO SSA AND RETAIN A COPY FOR YOUR RECORDS**

# PAPERWORK/PRIVACY ACT NOTICE

The Social Security Act (sections 205(a), 702, 1631(e)(1)(a) and (b), and 1869(b) (1) and (c), and Public Law 106-169 (Section 809(a)(1) of Sections 251(a)) as appropriate) authorizes the collection of information on this form. We need the information to continue processing your claim. You do not have to give it, but if you do not you may not receive benefits under the Social Security Act. We may give out the information on this form without your written consent if we need to get more information to decide if you are eligible for benefits or if a Federal law requires us to do so. Specifically, we may provide information to another Federal, State, or local government agency which is deciding your eligibility for a government benefit or program; to the President or a Congressman inquiring on your behalf; to an independent party who needs statistical information for a research paper or audit report on a Social Security program; or to the Department of Justice to represent the Federal Government in a court suit related to a program administered by the Social Security Administration. We explain, in the Federal Register, these and other reasons why we may use or give out information about you. If you would like more information, get in touch with any Social Security office, the Veterans Affairs Regional Office in Manila, or any U.S. Foreign Service post.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

Explanations about these and other reasons why information about you may be used or given out are available in Social Security offices. If you want to learn more about this, contact any Social Security office, the Veterans Affairs Regional Office in Manila, or any U.S. Foreign Service post.

**Paperwork Reduction Act Statement** - This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995 . You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 10 minutes to read the instructions, gather the facts, and answer the questions. **SEND THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. The office is listed under U. S. Government agencies in your telephone directory or you may call Social Security at 1-800-772-1213 (TTY 1-800-325-0778).** *You may send comments on our time estimate above to : SSA , 6401 Security Blvd, Baltimore, MD 21235-6401.* **Send only comments relating to our time estimate to this address, not the completed form.**

Slip Copy, 2010 WL 2196530 (N.D.W.Va.)

(Cite as: 2010 WL 2196530 (N.D.W.Va.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. West Virginia.
Janet ALLEN, Plaintiff,
v.
Michael J. ASTRUE, Commissioner of Social Security,
Defendant.
Civil Action No. 5:09CV81.

May 28, 2010.
Joyce H. Morton, Montie Vannostrand, Vannostrand &
Morton, PLLC, Webster Springs, WV, for Plaintiff.

Helen Campbell Altmeyer, U.S. Attorney's Office,
Wheeling, WV, for Defendant.

### MEMORANDUM OPINION AND ORDER AFFIRMING AND ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

FREDERICK P. STAMP, JR., District Judge.
#### I. Procedural History
**\*1** The plaintiff, Janet Allen, filed an application for
Supplemental Security Income ("SSI") and Disability
Insurance Benefits ("DIB") under Title II of the Social
Security Act. In the application, the plaintiff alleges
disability since April 1, 2003 because of fibromyalgia.

The Social Security Administration denied the
plaintiff's application initially and on reconsideration. The
plaintiff requested a hearing, and a hearing was held on
June 19, 2008, before Administrative Law Judge ("ALJ")
Randall W. Moon. The plaintiff, represented by counsel,
testified on her own behalf, as did Vocational Expert
("VE") John M. Panza. On December 11, 2008, the ALJ
issued a decision finding that the plaintiff had the
following severe impairments: fibromyalgia; degenerative
disc disease/degenerative arthritis of the cervical, thoracic
and lumbar spine; depressive disorder, not otherwise
specified; and anxiety disorder, not otherwise specified.
The ALJ found that none of the impairments or

combinations of impairments met the criteria for the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix
1. The ALJ determined that the plaintiff has the residual
functional capacity ("RFC") to perform light work as
defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) such
as crouching, stooping, and climbing ramps and stairs only
occasionally; changing positions at will; not work in
temperature extremes of hot or cold or high concentration
of smoke, dust or odors; no requirement to do jobs that
require high production rate or sales; no exposure to
hazards; performing simple, routine, one to three step
tasks; with only occasional contact with others. Thus, the
ALJ concluded that the plaintiff is capable of performing
past relevant work involving light housekeeping, as that
work does not require the performance of work-related
activities precluded by the plaintiff's RFC. The ALJ
determined that the plaintiff was not "disabled" within the
meaning of the Act and therefore not entitled to SSI or
DIB. The Appeals Council denied the plaintiff's request
for review, thus making the ALJ's decision the final
decision of the Commissioner. Thereafter, the plaintiff
filed the present civil action pursuant to 42 U.S.C. §
405(g), seeking judicial review of an adverse decision by
the defendant, Commissioner of Social Security.

The plaintiff previously applied for SSI and DIB on
June 13, 2003. The Social Security Administration denied
the claims at the reconsideration level on October 21,
2003. The plaintiff applied for DIB and SSI on July 22,
2004. Those claims were denied at the hearing level on
August 25, 2006. The plaintiff requested a review of the
decision on September 19, 2006 and the Appeals Council
affirmed the decision on August 16, 2007.

The present case was referred to United States
Magistrate Judge David J. Joel for submission of proposed
findings of fact and recommendation for disposition
pursuant to 28 U.S.C. § 636(b)(1)(B). Both the plaintiff
and the defendant filed motions for summary judgment. In
addition, the plaintiff filed a motion to include lost
documents in the administrative transcript. On March 22,
2010, the magistrate judge entered a report and
recommendation, recommending that the defendant's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2196530 (N.D.W.Va.)

(Cite as: 2010 WL 2196530 (N.D.W.Va.))

motion for summary judgment be granted, that the plaintiff's motion for summary judgment be denied, that the plaintiff's motion to include lost documents be denied, and that this case be stricken from the active docket of this Court. Upon submitting his report, Magistrate Judge Joel informed the parties that if they objected to any portion of his proposed findings of fact and recommendation for disposition, they must file written objections within fourteen days after being served with a copy of the report. The plaintiff filed timely objections.

## II. *Applicable Law*

*2 Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must conduct a *de novo* review of any portion of the magistrate judge's recommendation to which objection is timely made. As to those portions of a recommendation to which no objection is made, a magistrate judge's findings and recommendation will be upheld unless they are "clearly erroneous." *See Webb v. Califano,* 458 F.Supp. 825 (E.D.Cal.1979). Because the plaintiff filed objections, this Court will undertake a *de novo* review as to those portions of the report and recommendation to which objections were made.

## III. *Discussion*

In her motion for summary judgment, the plaintiff contends that the final decision of the Commissioner is not supported by substantial evidence. Specifically, the plaintiff argues that the ALJ erred because he (1) failed to comply with the Commissioner's Acquiescence Ruling ("AR") 00-1(4) and Fourth Circuit case law; (2) failed to include the prior ALJ decision in the record; (3) failed to associate the prior file; (4) failed to consider the prior final decision as evidence; (5) failed to perform the analysis and make the findings required by law regarding the evaluation process; (6) did not complete the sequential evaluation process; and (7) gave insufficient reasons for rejecting the only physical functional assessment performed by an examining source and failed to mention or to indicate the weight assigned to the mental RFC of Dr. Joseph. Additionally, the plaintiff argues that the **Appeals** Council failed to consider **counsel's** brief and additional **evidence submitted** and failed to **include** these submissions in the **record**.

The Commissioner contends that: (1) the ALJ

properly determined that the plaintiff could perform her past work as a housekeeper; (2) the prior ALJ determination of non-disability is **not** inconsistent with the current ALJ's decision; (3) the ALJ was **not** required to **include** the **record** from a previous ALJ decision; (4) there is no **evidence** that the **Appeals** Council failed to consider additional **evidence**; and (5) the ALJ properly weighed the medical opinion **evidence**.

Magistrate Judge Joel issued a report and recommendation, in which he held that: (1) substantial **evidence** supports the ALJ's findings **not** to give significant weight to the opinion of Dr. Lattimer; (2) the ALJ properly considered Dr. Joseph's opinion, and substantial **evidence** supports his RFC assessment of the plaintiff; (3) substantial **evidence** supports the ALJ's RFC assessment that the plaintiff can perform light work; (4) the ALJ could properly rely on the VE's testimony when determining whether the plaintiff can perform her past relevant work; (5) the ALJ properly considered the **evidence** and the prior decision from the 2006 application; (6) the ALJ was **not** required to reopen the prior 2006 application; (7) there is no **evidence** to support the plaintiff's allegation that the **Appeals** Council did **not** consider her brief or her additional **evidence**; (8) substantial **evidence** supports the ALJ's conclusion that the plaintiff can perform her past relevant work; and (9) substantial **evidence** supports the ALJ's decision that the plaintiff is **not** disabled and can perform work in the national economy.

* The plaintiff thereafter filed objections to the magistrate judge's report and recommendation. In these objections, the plaintiff argues that the magistrate judge (1) erred by **not** adhering to nor following the Commissioner's own rules and regulations; (2) erred by **not** recognizing the impact of an incomplete **record**; and (3) erred by finding in contrast to the **evidence** that no **evidence** supports the plaintiff's allegations that the **Appeals** Council failed to consider the brief and other **evidence submitted** to it.

An ALJ's findings will be upheld if supported by substantial **evidence**. *See Milburn Colliery Co. v. Hicks,* 138 F.3d 524, 528 (4th Cir.1998). Substantial **evidence** is that which a " 'reasonable mind might accept as adequate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to support a conclusion.' " *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Further, the " 'possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.' " *Sec'y of Labor v. Mutual Mining, Inc.,* 80 F.3d 110, 113 (4th Cir.1996) (quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966)).

In her objections, the plaintiff first argues that the ALJ failed to follow AR 00-1(4), which interprets two Fourth Circuit decisions, *Lively v. Secretary of Heath and Human Services,* 820 F.2d 1391 (4th Cir.1987), and *Albright v. Commissioner of Social Security Administration,* 174 F.3d 473 (4th Cir.1999). An ALJ "must consider a finding ... made in a final decision by an [ALJ] or Appeals Council on [a] prior ... claim." AR 00-1(4). Specifically, an ALJ "must consider such finding as evidence and give it appropriate weight in light of all the relevant facts and circumstances when adjudicating a subsequent disability claim." *Id.* The ALJ should consider the following factors:

> (1) whether the fact on which the prior finding was based is subject to change with the passage of time; (2) the likelihood of such a change, considering the length of time that has elapsed ...; and (3) the extent that evidence not considered in the [previous] final decision ... provides a basis for making a different finding.

*Melvin v. Astrue,* 602 F.Supp.2d 694, 701 (E.D.N.C.2009) (quoting AR 00-1(4)). HALLEX [FN1] 1-5-4-66 interprets AR 00-1(4). *Id.* HALLEX 1-5-4-66 "requires the ALJ to refer to AR 00-1(4) and include rationale in the decision on what weight the ALJ gave the prior ALJ's findings." *Id.*

> FN1. "HALLEX is a manual in which 'the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff. HALLEX includes policy statements resulting from an Appeals Council *en banc* meeting under the authority of the Appeals Council Chair. It also

defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels.' " *Marvin,* 602 F.Supp.2d at 699-700 (quoting Soc. Sec. Admin., Office of Hearings and Appeals, *Hearing, Appeals and Litigation Law Manual* 1-1-0-1 (June 21, 2005).

The previous ALJ ruled that the plaintiff is not disabled and that she is capable of performing light work. However, the ALJ found that the plaintiff was not capable of returning to her past work as a housekeeper because her work as a housekeeper did not allow for a sit/stand option. This Court disagrees with the government that the RFC is "basically identical" and that the only difference between the VE testimony is that the "plaintiff's housekeeper job has a sit/stand option." The government states that the current ALJ found the same RFC, which included a sit/stand option. This Court finds that the current ALJ did not include a sit/stand option in the RFC. The ALJ stated in the hearing, in an exchange with the plaintiff's counsel, that if he used the same RFC as the previous ALJ two years earlier, the plaintiff would not be able to return to her previous work. Tr. at 83.

**\*4** This Court overrules the plaintiff's objection that the ALJ violated AR 00-1(4). The ALJ allowed the plaintiff to submit 174 pages of exhibits from the prior application, which included the previous ALJ decision. Tr. 25, 704-877. The ALJ further allowed the plaintiff to identify and argue at the hearing what evidence she considered new and material. Tr. 9, 24-29. In his decision, the ALJ did mention the plaintiff's prior attempts to receive benefits. Tr. at 9. Here, "the ALJ evaluated the whole record, applied the governing legal standard, and denied plaintiff's claim." *Marvin,* 602 F.Supp.2d at 702. While the ALJ did not specifically reference AR 00-1(4) or HALLEX 1-5-4-66 or explain the precise weight he gave the ALJ's findings from 2006, this Court finds that the ALJ did consider the prior ALJ's findings as part of reviewing the record. *See* Tr. at 12 ("After careful consideration of the entire record, the undersigned makes the following findings ..."); Tr. at 20 ("In sum, the above residual functional capacity assessment is supported by the reports made to the claimant's physicians, the objective

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2196530 (N.D.W.Va.)

(Cite as: 2010 WL 2196530 (N.D.W.Va.))

evidence of record and the record in its entirety.").

This Court finds that the ALJ complied with *Albright* and *Lively.* In *Lively,* an ALJ denied Lively DIB on October 19, 1981, finding that he was not disabled and able to perform light work. *Lively,* 820 F.2d 1391, 1391. The Appeals Council affirmed the decision. *Id.* at 1392. On November 18, 1983, the reviewing district court held that the Secretary's conclusion that Lively was restricted to light work was supported by substantial evidence. *Id.* On December 14, 1983, Lively filed another application, in which the ALJ concluded that Lively was not disabled and that Lively could perform work at any exertional level on or before December 31, 1981. *Id.* The Fourth Circuit stated that it was "utterly inconceivable that his condition had so improved in two weeks as to enable him to perform medium work." *Id.*

The plaintiff argues that the ALJ and magistrate judge erred because the plaintiff filed the current, third application one month after the denial of the second application. The plaintiff argues that there is only a one month difference in the time period. This Court does not agree. The plaintiff cites no law for her opinion that the relevant time period is one month. The Fourth Circuit has not expressly stated how reviewing courts are to measure the applicable time period. In *Lively,* the relevant time period was the date between the first ALJ decision and the plaintiff's fifty-fifth birthday. *Id.* Had the plaintiff been fifty-five years old at the time of the decision, he would have been entitled to benefits. *Id.* The only variable that changed was the plaintiff's age. *Id.* In *Albright,* the Fourth Circuit used the date of the first ALJ decision and the date the plaintiff's insurance status expired. *Albright,* 174 F.3d at 477. This calculation yielded a difference of three years. *Id.* In *Albright,* the second application was filed in November 1992, six months after the denial of the first application, yet the Fourth Circuit stated the applicable time period was three years. *Id.*

**\*5** Two recent district court opinions from within the Fourth Circuit use the formula suggested by the plaintiff. In *Melvin,* the Eastern District of North Carolina quoted from *Albright,* stating that it was "imprudent to pronounce, as a matter of law, that [a claimant's] ability to perform in the workplace could have diminished between [when the

initial claim was decided] and [when the new claim was filed]." *Melvin,* 602 F.Supp.2d at 700. This quotation of the Fourth Circuit is not accurate because the new claim was filed in *Albright* six months after the first denial, not three years. *Albright,* 174 F.3d at 474. As previously mentioned, the *Albright* court used the date the plaintiff's insured status expired, not the date the new claim was filed. Similarly, in *Gilliam v. Astrue,* 2010 WL 1009726, *14 (S.D.W.Va. March 18, 2010), Magistrate Judge Mary E. Stanley found that the relevant time period is the date of the ALJ's previous decision and the date of the current application.

This Court cannot agree that the Fourth Circuit believes the relevant time period for this calculation is the date of the previous denial and the date of the current application. Looking to the language of *Albright,* this Court first notes that the Fourth Circuit did not apply those dates in that case. *Albright,* 174 F.3d at 477. Secondly, to support its statement that, "[w]here, as here, the relevant period exceeds three years, our swagger becomes barely discernible," the *Albright* court cited to *Rucker v. Chater,* 92 F.3d 492, 495 (7th Cir.1996). *Id.* at 477 n. 7. In *Rucker,* the Seventh Circuit distinguished *Lively,* finding that the plaintiff had filed his two applications four years apart. *Rucker,* 92 F.3d at 495. The *Rucker* court did not use the first application denial date and the second application date. *Id.* This citation to *Rucker* evidences the Fourth Circuit's intent with regard to the relevant time period statement.

This Court finds that the relevant time period here is two years, not one month. As the ALJ discussed at the hearing, the previous ALJ made his RFC determination more than two years prior to the current ALJ. The record for this hearing included more reports from doctors and more information on the plaintiff's daily activities, which the ALJ discussed. In contrast to *Lively,* there have been material changes in the two years, as found by the ALJ.

The ALJ stated that he considered all the evidence in the record. Further, the record contains the findings in the 2006 decision. As mentioned above, he considered the plaintiff's most recent effort to receive benefits, applied the governing legal standard, and rejected the request for benefits. This Court finds that the ALJ complied with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Albright* and AR 00-1(4). *Melvin*, 602 F.Supp.2d at 704. However, the ALJ did not specifically comply with HALLEX 1-5-4-66 by not specifically mentioning the factors of AR 00-1(4). HALLEX, as an internal guidance tool, "lacks the force of law." *See id.* (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (holding that agency interpretations contained in policy statements, agency manuals, and enforcement guidelines lack the force of law)). Even if HALLEX were binding, the plaintiff has failed to show prejudice from the ALJ's failure to cite to AR 00-1(4).

**\*6** This Court overrules the plaintiff's second objection. The plaintiff's second objection consists of two separate objections. First, the plaintiff argues that the **record** is incomplete because the magistrate judge denied her request to supplement the **record** with lost documents. The second contention involves the ALJ's denial of the plaintiff's request to reopen the prior claim based upon "new and material **evidence** from a rheumatologist."

A "[d]istrict court may only order additional **evidence** to be taken before the Commissioner upon a showing that there is new **evidence** which is material and that there is good cause for the failure to incorporate such **evidence** in a prior proceeding." *Smith v. Chater*, 99 F.3d 635, 638 n. 5 (4th Cir.1996). **Evidence** is considered new "if it is **not** duplicative or cumulative" and "material if there is a reasonable possibility that the new **evidence** would have changed the outcome." *Wilkins v. Sec' y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991).

The plaintiff, in her motion to **include** lost documents in the administrative transcript, asks this Court to allow additional **evidence** to be added to the transcript. The **evidence** consists of three letters from the plaintiff's **counsel** to the Appeals Council and medical **records**. Document 11-1 consists of treatment notes, primarily consisting of feminine issues and chest pains, which are unrelated to the plaintiff's severe impairment. Document 11-2 consists of two pages of three office visit notes. One of these office visits is already in the **record**. Document 12 consists of 61 pages of various materials, **including** medical **records** regarding feminine issues and documents relating to the plaintiff's application for Medicaid. Most of the medical **records** relating to the plaintiff's severe

impairment are already in the **record**. There is a letter to Doctor Arturo Sabio from Doctor Shelly P. Kafka, in which Doctor Kafka discusses her rheumatological consultation of the plaintiff. The plaintiff argues that this Court should grant her motion because the **records** were **submitted** to the **Appeals** Council as part of her request for review, but were erroneously omitted from the transcript. While the plaintiff admits there is "minor duplication" of exhibits already in the **records**, she contends the documents are relevant because they show the **evidence** relied upon by the West Virginia Department of Health and Human Resources Medical Review Team, which the plaintiff states found her disabled for purposes of Medicaid. The Commissioner contends that the **records** are cumulative.

After a *de novo* review, this Court concurs with the magistrate judge that admission is **not** warranted. The documents are cumulative and are **not** material as they mostly do **not** relate to the plaintiff's severe impairment and predominantly discuss either feminine medical issues or the plaintiff's West Virginia Medicaid application. Accordingly, the plaintiff has failed to show that there is a "reasonable possibility that the **records** would have changed the outcome of the case." *Bush v. Astrue*, 2008 WL 4279925, \*5 (N.D.W.Va. Sept. 17, 2008) (citing *Wilkins*, 953 F.2d at 96).

**\*7** The plaintiff next contends that the ALJ failed to reopen the prior disability application. An ALJ has the discretion to reopen a prior disability application if there is good cause or if there is new and material evidence; a clerical error in the computation or recomputation of benefits; or the evidence that was considered in making the determination clearly shows on its face that an error was made. 20 C.F.R. § 404.989. The ALJ found that there was no new and material evidence that would support reopening the prior decision. Tr. at 9. The Supreme Court has stated that 42 U.S.C. § 405(g) "cannot be read to authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits." *Califano v. Sanders*, 430 U.S. 99, 108 (1977). Accordingly, the plaintiff's second objection is overruled.

This Court overrules the plaintiff's third objection. The plaintiff argues that the **Appeals** Council failed to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

consider the brief she filed or the additional **evidence** she **submitted** on **appeal** because the additional **evidence** and brief are **not** in the **record** and the **Appeals** Council did **not** discuss the **evidence** or the brief in its denial for review. This Court agrees with the magistrate judge that there is no **evidence** to support the plaintiff's allegation that the **Appeals** Council did **not** review the document. In its denial, the **Appeals** Council stated that it would have reviewed the plaintiff's case if it would have received "new and material **evidence** and the decision [was] contrary to the weight of all the **evidence** now in the **record**." Tr. at 1. Further, the **Appeals** Council stated that it considered all of the reasons she disagreed with the decision and found that the information did **not** provide a basis for changing the ALJ's decision. *Id.* More importantly, the **Appeals** Council had no obligation to review the proposed "new" material because the plaintiff did **not submit** the **evidence** within sixty days of the ALJ's decision. *See* 20 C.F.R. § 404.968 (requiring that any documents for the **Appeals** Council to consider to be **submitted** with the request for review, to be filed within sixty days of the ALJ's decision, unless the plaintiff files a written request for an extension of time). The plaintiff's **counsel** did **not submit** the new **evidence** with the request for review on January 20, 2009. Further the plaintiff's **counsel** did **not** file a written request for an extension of time, giving the reasons for the late filing and showing good cause, which the regulations require. *Id.* Further, the form the plaintiff used for requesting review by the **Appeals** Council advised the plaintiff that she was to **submit** additional **evidence** with the request for review and that if she needed extra time to **submit** additional **evidence**, it was plaintiff's **counsel's** responsibility to **submit** a written request for an extension along with an explanation for why the extension was necessary. Tr. at 4. Here, the ALJ denied the plaintiff's request for benefits on December 11, 2008. On January 20, 2009, the plaintiff requested review from the **Appeals** Council without **submitting** additional **evidence** or requesting an extension of time to **submit** additional **evidence**. On February 27, 2009, 78 days after the ALJ's adverse decision, plaintiff's **counsel** sent the **Appeals** Council "additional **evidence**," which she wanted the **Appeals** Council to associate with the plaintiff's file. The additional **evidence** consists of four pages of **records** from the Braxton Community Health Center. The plaintiff gives no reason why she did **not**

**submit** these pages with the request for review or why she filed them late. On March 17, 2009, 96 days after the ALJ's adverse decision, the plaintiff filed a brief with the **Appeals** Council, again **not** explaining the delay in filing. On May 20, 2009, 160 days after the adverse decision, the plaintiff's **counsel** sent two pages of office visit notes from 2007 and 2008, again **not** explaining why the documents were untimely **submitted**. Because the plaintiff did **not** comply with the procedures for **submitting** additional **evidence** to the **Appeals** Council, the **Appeals** Council had no duty to examine the additional **evidence**. *Id. See also Miller v. Barnhart,* 194 Fed. App'x 519, 522 (10th Cir. Sept. 6, 2006) (unpublished); *Schmidt v. Barnhart,* 395 F.3d 737, 744 n. 2 (7th Cir.2005); *Harris v. Comm'r of Social Security,* 2009 WL 6364253, *10 (W.D.Mich. Sept. 2, 2009) (unpublished); *King v. Barnhart,* 2002 WL 598529, * 6 (N. D.Ill. Apr. 18, 2002) (unpublished).

**\*8** This Court has reviewed the record, as well as the parties' motions for summary judgment, and after a *de novo* review, concurs with the magistrate judge that the Commissioner's decision that the plaintiff was not disabled and the RFC are supported by substantial evidence. Accordingly, the magistrate judge's report and recommendation is affirmed and adopted.

### IV. *Conclusion*

Based upon a *de novo* review, this Court hereby AFFIRMS and ADOPTS the magistrate judge's report and recommendation in its entirety. Thus, for the reasons stated above, the defendant's motion for summary judgment is GRANTED, and the plaintiff's motion for summary judgment is DENIED. The plaintiff's motion for leave to file lost documents is DENIED. It is further ORDERED that this case be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is directed to transmit a copy of this order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is directed to enter judgment on this matter.

N.D.W.Va.,2010.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2196530 (N.D.W.Va.)

(Cite as: 2010 WL 2196530 (N.D.W.Va.))

Allen v. Astrue
Slip Copy, 2010 WL 2196530 (N.D.W.Va.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.